**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

ALIREZA SADEGHI, M.D. AND                    CIVIL ACTION
TAYLOR THEUNISSEN, M.D.

VERSUS

AETNA LIFE INSURANCE                          20-445-SDD-EWD
COMPANY

CONSOLIDATED WITH

ALIREZA SADEGHI, M.D. AND                    CIVIL ACTION
TAYLOR THEUNISSEN, M.D.

VERSUS

AETNA LIFE INSURANCE                          20-447-SDD-EWD
COMPANY

**<u>RULING</u>**

This matter is before the Court on the *Motion for Partial Summary Judgment*[1] filed by Defendant, Aetna Life Insurance Company ("Aetna" or "Defendant").  Plaintiffs, Alireza Sadeghi, M.D. ("Sadeghi") and Taylor Theunissen, M.D. ("Theunissen"), or collectively ("Plaintiffs"), have filed an *Opposition*[2] to this motion, to which Defendant filed a *Reply*.[3]  For the following reasons, Aetna's motion shall be granted.

---

[1] Rec. Doc. No. 24.
[2] Rec. Doc. No. 30.
[3] Rec. Doc. No. 34.
Document Number: 68818                                                    1

Generally, these consolidated lawsuits arise out of Aetna's alleged under-reimbursement of Plaintiffs, both plastic surgeons, for post-mastectomy breast reconstruction surgeries on two patients, identified as Member 1 and Member 2. Plaintiffs were out of network with Aetna. Plaintiffs allege that Aetna entered into an In-Network Exception with Plaintiffs for the surgeries, promising that the patients would be financially responsible only for in-network cost-sharing requirements and not for the balance bill.

However, Plaintiffs claim, after performing the breast reconstruction surgeries under the In-Network Exception agreements, Aetna breached the In-Network Exception agreements and refused to apply them. Thus, Plaintiffs were under-reimbursed by not being paid according to the In-Network Exception agreements, and Defendant failed to preclude the patients from being balance billed.

## I.    CHALLENGED DOCUMENTS

At the outset, the Court must address Plaintiffs' objections to Defendant's exhibits. Plaintiffs claim that the documents Defendant bases its *Statement of Undisputed Facts* upon were never produced to Plaintiffs in discovery, and Plaintiffs were "ambush[ed]," seeing these exhibits for the first time when they were filed with this motion.[4]  Plaintiffs also argue that these exhibits should be stricken because Defendant failed to file an Affidavit or Declaration to authenticate the documents.

Defendant contends that the documents at issue were either provided to Plaintiffs through this litigation or exchanged between the Parties in pre-litigation appeals and discussions.   Further, Plaintiffs sought to stay discovery, which was granted.[5]

---

[4] Rec. Doc. No. 30, p. 11.
[5] Rec. Doc. No. 23.
Document Number: 68818

Additionally, Plaintiffs rely on many of these documents in their *Opposition* to Defendant's motion, which Defendant claims demonstrates that this objection is disingenuous.

On the same day Defendant filed its *Reply* brief, it also filed an *Opposed Motion for Leave to Supplement its Memorandum in Support of its Motion for Partial Summary Judgment*.[6]  In this motion, Defendant sought leave to file the Declaration of Kimberly Depaepe to authenticate its Motion's supporting exhibits. The *Opposed Motion for Leave to Supplement* was filed on April 1, 2021.  The Court waited more than 21 days, giving Plaintiffs an opportunity to respond and support their opposition to Defendant's motion, but no response was submitted.  Thus, the Court granted the *Opposed Motion for Leave to Supplement* on April 29, 2021.[7]  To date, Plaintiffs have never sought leave to respond to the explanations presented by Defendant regarding these documents.

The Court allowed the Declaration of Kimberly Depaepe for the purpose of authenticating the documents submitted by Defendant.   Thus, Plaintiffs' wholesale objection to authenticity is OVERRULED as moot.

Rule 37 of the Federal Rules of Civil Procedure provides factors for the Court to consider in determining whether evidence should be excluded for a failure to disclose.  In reaching this determination, the Court must consider: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose."[8]

---

[6] Rec. Doc. No. 35.
[7] Rec. Doc. No. 44.
[8] *Texas A & M Research Foundation v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).

The importance of the documents in question in this matter is exceptional.  The Court is tasked with determining whether Plaintiffs' state law breach of contract claim and detrimental reliance claim are preempted by ERISA.  The administrative record and other documents relating to the inception of this dispute are necessary for the Court's resolution of this motion.

As to the prejudice to the Plaintiffs, Plaintiffs have failed to demonstrate a high degree of prejudice.  Plaintiffs cannot claim ambush when they received several of the documents during pre-litigation; Plaintiffs likewise rely upon these documents in opposing Defendant's motion.  Plaintiffs sought to stay discovery, which was granted.  And, Plaintiffs have never sought leave to respond to or rebut Defendant's explanations.

Regarding a continuance, the Court does not find this necessary.  Defendant responded to Plaintiffs' complaints about this evidence on April 1, 2021.  Plaintiffs have had several months to move for leave to respond to Defendant's claims or to move to supplement their pleadings in light of Defendant's claims.  Plaintiffs have not done so, thus no continuance of this motion is warranted.

Finally, the Court finds Defendant's explanations for the failure to disclose to be reasonable under the circumstances.  Again, Plaintiffs have not rebutted Defendant's position.  Accordingly, the Court will not strike Defendant's exhibits.  Plaintiffs' objections to these documents are OVERRULED.

Defendant moves to strike the Declaration of Robert J. Axelrod,[9] counsel for Plaintiffs, because the Declaration does not attest that Axelrod has personal knowledge of the contents of the Declaration or the attached exhibits.  Citing no authority, Aetna also

---

[9] Rec. Doc. No. 30-2.

argues that the Court cannot infer his personal knowledge based on his position as Plaintiffs' counsel.    Nevertheless, the Court's review of the exhibits submitted demonstrates that they are the same documents submitted as evidence by Defendant. Defendant concedes as much: "The Court's consideration of the documents produced both with Defendant's and Plaintiffs' briefing is appropriate, even above the objections of both sides, to determine whether ERISA governs the claims herein."[10]  Thus, the Court overrules Defendant's objection and will consider the exhibits submitted by Plaintiffs.

## II.    FACTUAL BACKGROUND

Local Rule 56(f) provides:

> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. **An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion**. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. **The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts**. (emphasis added).

Local Rule 56 (c) requires an opposing party to:

> submit with its opposition a separate, short, and concise statement of material facts. **The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule**. Each such statement shall begin with the designation "Admitted," "Denied," or "Qualified" and, in the case of an admission, shall end with such designation. The opposing statement may contain in a separately titled section additional facts, each set forth in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule.

---

[10] Rec. Doc. No. 34, p. 10.
Document Number: 68818

Unless otherwise indicated, set forth below are facts deemed admitted for purposes of this Motion based on Plaintiffs' failure to comply with Local Rules 56(c) & (f) of the Middle District of Louisiana. Where Plaintiffs failed to cite to record evidence in denying Defendant's statements or submitted argument rather than a supported factual statement, the Defendant's proffered statements of fact are deemed admitted as not properly controverted under the Local Rules of Court.

Plaintiffs were not contracted providers within Aetna's network. Plaintiffs were out-of-network providers on the dates of service at issue in this litigation.[11] ExxonMobil Corporation sponsored the self-funded employee health benefit plan named the ExxonMobil Medical Plan ("Exxon Plan") at issue in Case No. 20-445-SDD-EWD (Case 445).

> Exxon Mobil Corporation sponsors the following self-funded employee health benefits plans: ExxonMobil Medical Plan…. These plans were established pursuant to the Employee Retirement Income Security Act of 1974 as amended, for certain eligible Plan Participants.[12]
> * * *
> Plan funding. The Plan is funded through participant and company contributions.[13]

The Exxon Plan was established pursuant to ERISA for eligible employees, dependents, beneficiaries, retirees, or members: "'Plan Participant' or 'Participant' means those employees, dependents, retirees, surviving spouses and dependents, individuals with COBRA coverage and family members who are entitled to benefits as communicated

---

[11] Rec. Doc. No. 6, p. 1; 3:20-CV-447-SDD-EWD, Rec. Doc. No. 6, p. 1.
[12] Rec. Doc. No. 27, p. 2. Plaintiffs qualify only to state that the Amended Complaint refers to the ExxonMobil Benefit Plan. Rec. Doc. No. 30-1, p. 3.
[13] Rec. Doc. No. 27-1, p. 89.
Document Number: 68818

to Aetna."[14]  The Exxon Plan is governed by ERISA.[15]

Aetna provided integrated claim administration and supplemental administrative services for the Exxon Plan: "Aetna provides integrated claim administration and supplemental administrative services … to Plans as provided in the Service Agreement."[16]  Further, Aetna contracted with providers to provide services to its Plan Participants at agreed upon rates:

> Aetna shall provide Plan Participants with access to Aetna's network hospitals, physicians and other health care providers (Network Providers) who have agreed to provide services at agreed upon rates and who are participating in the network covering the Plan Participants.[17]
>
> * * *
>
> Retiree Medical POS II (Point of Service) A network of established physicians, hospitals and other medical care providers whose credentials have been screened according to Aetna's standards and who have agreed to provide their services at negotiated rates. The Retiree Medical Plan POS II is a network specifically selected by the Plan — it is part of Aetna's Choice® POS II. This network is referred to in this SPD as the Retiree Medical POS II.[18]

Member 1 was a beneficiary and covered by the Exxon Plan on the dates of service at issue in this litigation.[19]  The Exxon Plan required precertification for certain services.[20]

---

[14] Rec. Doc. No. 27, pp. 2-3. Plaintiffs admit that the Exxon Plan was an ERISA plan but offer the legal conclusion that ERISA does not preempt the state law causes of action alleged in this case.  Rec. Doc. No. 30-1, p. 3.  Because this is a purely legal conclusion and does not contradict with record evidence the factual statement offered, Defendant's fact is deemed admitted.

[15] Rec. Doc. No. 27-1, p. 31 ("Administrative and ERISA information. This Plan is subject to rules of the federal government, including the Employee Retirement Income Security Act of 1974, as amended (ERISA), not state insurance laws.").  Rec. Doc. No. 27-1, p. 89 ("Type of plan. The ExxonMobil Retiree Medical Plan is a welfare plan under ERISA providing medical benefits.").

[16] Rec. Doc. No. 27, p. 2.  Plaintiffs do not counter this fact but argue that it is irrelevant to this matter.  This objection is OVERRULED.

[17] *Id*. at p. 35.

[18] Rec. Doc. No. 27-1, p. 103.  Plaintiffs object to the relevance of this fact, which the Court OVERRULES. All other comments by Plaintiffs as to this fact are arguments or statements without citation to record evidence.

[19] Rec. Doc. No. 6, p. 1; Rec. Doc. No. 27-1, pp. 117–19 (identifying Member 1 as a Plan Member and verifying eligibility on the date of service).

[20] Rec. Doc. No. 27-1, p. 41.

Document Number: 68818

Pursuant to Plaintiffs' request, Aetna issued an In-Network Exception pre-authorizing the requested services at the in-network benefit level under the Exxon Plan:[21] "This service is approved at an in-network benefit level. The provider identified to provide this service participates with this plan. The member will be responsible only for in-network cost-sharing requirements."[22]  The In-Network Exception stated: "Reimbursement will be based on standard coding and bundling logic and any mutually agreed upon contracted or negotiated rates, subject to any and all copays or coinsurance requirements."[23]  Aetna contends the In-Network Exception provided no specific rates for the services.[24]  Plaintiffs deny this fact and contend that the In-Network Exception Agreement stated: "This service is approved at an in-network benefit level."[25]

On September 10, 2018, Plaintiffs, as co-surgeons, performed the surgery on Member 1.[26]  Plaintiffs admit this fact but further state that Aetna treated Plaintiffs as assistant surgeons and denied reimbursement on this basis.[27]  Plaintiffs submitted claims to Aetna for the surgery on November 10 and 14, 2018.[28] Aetna separated Plaintiffs' claims to expedite adjudication.[29]

---

[21] Rec. Doc. No. 27-1, p. 162; Rec. Doc. No. 6, p. 4.

[22] Id. at pp. 117-20.  Plaintiffs offer legal arguments but no contrary facts supported by record evidence. Rec. Doc. No. 30-1, p. 5.

[23] Id. at p. 120.  Plaintiffs admit but object, arguing that this quote does not represent the entirety of the statement, which also stated: "This service is approved at an in-network benefit level. The member will be responsible only for in-network cost-sharing requirements."  Rec. Doc. No. 30-1, p. 5.  Plaintiffs also contend this agreement stated what Defendant offers in Statement No. 15.

[24] Id. at pp. 116-37.

[25] Rec. Doc. No. 27-1, pp. 117, 127, 133. Rec. Doc. No. 30-3, pp. 2–7.

[26] Rec. Doc. No. 6, pp. 2–4.

[27] Id. at p. 5.

[28] Rec. Doc. No. 27-1, pp. 166, 168, 170. Plaintiffs dispute this fact, stating that the "received date" was not the "submission date," but no record citation is provided in support. Rec. Doc. No. 30-1, p. 6.

[29] Rec. Doc. No. 27-1, pp. 166, 168. Plaintiffs dispute whether this "expedited" adjudication of the claims. Rec. Doc. No. 30-1, p. 6.

Document Number: 68818

Member 1 was a beneficiary and covered by the Exxon Plan on the dates of service at issue in this litigation:

> Coverage Approvals: For the services identified above for which coverage has been approved, all three components of coverage approval process have been satisfied:
>
> • Verification of the member's eligibility for coverage under the plan; and
> • Verification that the plan provides coverage for the type of services approved (but, has not verified whether any applicable dollar limits under the plan have been exhausted, or will soon be exhausted); and
> • Verification that the approved services meet medical necessity criteria.[30]

The Exxon Plan excluded and did not reimburse certain services:

> Exclusions for the ExxonMobil Retiree Medical POS II 'A' and POS II 'B' Plans.… Although the Plan covers many types of treatments and services, it does not cover them all. Exclusions shall be interpreted and applied consistently with Clinical Policy Bulletins published by Aetna.[31]
>
> * * *
>
> No benefits are payable under the Plan … for any charge incurred for:
> … Treatment not specifically covered or meeting the Plan's requirement for medical necessity for the care or treatment of a particular disease, injury, or pregnancy.…[32]
>
> … Any expenses that exceed reasonable and customary limits.…[33]
>
> * * *
>
> Reimbursement to non-network providers will be limited to a reasonable and customary amount, rather than billed charges.… Only amounts that are above the reasonable and customary fee schedule will be considered for reimbursement. Charges for services not covered by the plan will not be reprocessed.[34]

Aetna contends it denied Plaintiffs' co-surgeon claims pursuant to the terms of the Exxon Plan:

---

[30] Rec. Doc. No. 6, p. 1; Rec. Doc. No. 27-1, p. 120.
[31] Rec. Doc. No. 27-3, pp. 4, 14; Rec. Doc. No. 27-1, p. 41.
[32] Rec. Doc. No. 27-3, pp. 4, 14; Rec. Doc. No. 27-1, pp. 68, 70.
[33] Rec. Doc. No. 27-3, pp. 4, 15; Rec. Doc. No. 27-1, p. 68.
[34] Rec. Doc. No. 27-3, p. 5, 15; Rec. Doc. No. 27-1, p. 75.

> The prevailing reimbursement for this surgery includes any elective services of a surgeon … assisting the operating surgeon. Therefore, the charge for the … co-surgeon … is not covered under the member's plan.[35]

Plaintiffs acknowledge that Aetna denied their co-surgeon claims, but Plaintiffs dispute that Aetna did so pursuant to the terms of the Exxon Plan.[36] Aetna contends it paid Plaintiffs' remaining claims pursuant to the terms of the Exxon Plan: "Member's plan allows up to 200% of the Medicare Allowable Rate for charges covered by their plan."[37]

Aetna contends Plaintiffs appealed the benefit determination as ERISA assignees of Member 1.[38]  Plaintiffs deny this characterization and claim that they appealed on behalf of Member 1 as Designated Authorized Representatives, not assignees.[39] Plaintiffs also note that the Exxon Plan has an anti-assignment provision.[40]  Aetna claims Plaintiffs' appeal raised the following issues: (1) denial of co-surgeon claims; (2) network adequacy; (3) Women's Health and Cancer Rights Act ("WHCRA") violations; and (4) breach of fiduciary duty by failing to provide an adequate determination notice.[41]  Plaintiffs dispute this claim and contend their appeal raised additional issues including not limited to those indicated in the Statement: (5) a CPT code was erroneously denied; (6) Defendants should have negotiated rates with Plaintiffs; (7) the Louisiana State statutes mandate coverage for post-mastectomy breast reconstruction surgery; (8) the claims must be paid with interest; and (9) the claim file used to adjudicate the claim must be produced.[42]

---

[35] Rec. Doc. No. 27-1, p. 166, 170.
[36] Rec. Doc. No. 30-3, pp. 2–7.
[37] Rec. Doc. No. 27-1, 168, 170.
[38] Rec. Doc. No. 27-2, pp. 13, 36.
[39] *Id.* at p. 26; Rec. Doc. No. 30-3, p. 14.
[40] Rec. Doc. No. 30-3, p. 70.
[41] Rec. Doc. No. 27-2, pp. 5–7.
[42] Plaintiffs cite to Aetna's Statement No. 21.

Document Number: 68818

Plaintiffs' appeal requested documents related to the adverse benefit determination, pursuant to ERISA:

> We Hereby Make Demand to Review Pertinent Documents Related To the [sic] Adverse Determination In order that the member/DAR may fairly evaluate and respond to the claim denials issued herein, they are entitled to and require the entire claim file pertinent to this claim denial, including but not limited to all the items annexed hereto as Exhibit A, including publications, database and schedules used to determine your usual, customary and reasonable charges or "Allowable Amounts" for this plan in accordance with DOL Advisory Opinion 96-14A.[43]
>
> * * *
>
> ERISA Section 503(2) and the accompanying regulations require plans to provide an integral process for the appeal of any benefit claim denial. The review procedure must allow a member/DAR or his designated authorized representative to: (1) Request a review upon written application to the plan; (2) Review pertinent documents, and (3) Submit issues and comments in writing. A claim administrator who relies on internal rules or guidelines in making a decision on a claim must make those rules or guidelines available to the member/DAR with the appeal determination or upon request. 29 C.F.R. § 2560.503-1(g)(1)(v)(A).[44]

After reviewing Plaintiffs' appeal, Aetna upheld the original adjudication of the claims, including the denial of the co-surgeon claim and the application of out-of-network benefits under the Exxon Plan.[45]

> … [W]e are upholding the previous decision regarding the denial for the assistant/co-surgeon at surgery … and the benefit applied to the assistant surgeon….[46]
>
> * * *
>
> Surgical assistants/assistant surgeons … If your physician is assisted during the procedure by another physician (assistant surgeon), billed charges will be reduced to 25% of the reasonable and customary (R&C) allowance or 25% of the participating fee if in-network for each surgical procedure, according to the allowance for assistant surgeon fees.[47]

---

[43] Rec. Doc. No. 27-2, p. 8.

[44] *Id.* at p. 8, n. 5.  Plaintiffs object to the relevance of this information, which the Court OVERRULES.

[45] Plaintiffs acknowledge they have no information to dispute this fact; Plaintiffs object to this information as irrelevant, which the Court OVERRULES.  Rec. Doc. No. 30-1, pp. 9-10.

[46] Rec. Doc. No. 27-3, pp. 3, 14.

[47] Rec. Doc. No. 27-1, p. 74.

* * *

… Alireza Sadeghi, MD is not a contracted provider with Aetna; therefore, the claim was processed based on the reasonable and customary amount. The plan does not cover expenses that exceed reasonable and customary limits.[48]

* * *

When you use non-network providers: … If your provider's charges are above reasonable and customary limits, you are responsible for paying any amounts above reasonable and customary limits. You may be balance billed by the provider for any amount not reimbursed by Aetna.[49]

In its appeal decision letter, Aetna notified Plaintiffs of their internal appeal rights.[50]

Thereafter, Plaintiffs filed a second-level appeal (as ERISA assignees of Member 1) raising the following issues: (1) denial of co-surgeon claims; (2) network adequacy; (3) WHCRA violations; (4) breach of fiduciary duty by failing to provide an adequate determination notice; and (5) illusory representation of member out-of-network benefits.[51]

Aetna responded on May 27, 2019 (Theunissen) and June 3, 2019 (Sadeghi), notifying Plaintiffs that their internal appeal rights had been exhausted and referenced its first-level decision, including the voluntary level of appeal to Exxon or civil action under ERISA § 502(a):

We received a request for an appeal on …. However, you have used all your internal appeal rights. Please refer to the enclosed appeal resolution letter, which explains our decision and has information about any other appeal rights available to you.

* * *

If you have new, relevant information pertinent to the claim, you may file a voluntary appeal with the Administrator-Benefits. … The Administrator-Benefits may be contacted at P.O. Box 64111, Spring, TX 77387-4111 to file the appeal or to obtain a copy of the voluntary appeals procedures.

---

[48] Rec. Doc. No. 27-3, pp. 4, 14.
[49] Rec. Doc. No. 27-1, p. 46.
[50] Rec. Doc. No. 27-3, pp. 5, 15–16. Plaintiffs object to this statement as irrelevant, which the Court OVERRULES. Rec. Doc. No. 30-1, p. 10.
[51] Rec. Doc. No. 27-4, p. 39. Plaintiffs deny this statement as will be set forth below.

If you feel your mandatory appeal was incorrectly decided, you may bring a civil action under Section 502(a) of ERISA, if applicable, without requesting a voluntary appeal.[52]

The Court now turns to Member 2's surgeries.  Entergy Corporation sponsored the self-funded employee health benefit plan – the Entergy Corporation Companies' Benefits Plus Medical Plan ("Entergy Plan") – at issue in Case No. 20-447-SDD-EWD.[53]  The Entergy Plan was established pursuant to ERISA for certain eligible individuals:

> WHEREAS, Entergy Corporation ("Sponsor") has established a self-funded employee health benefits plan for certain eligible individuals pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") as described in the Summary Plan Descriptions listed in Appendix I of this Services Agreement[.][54]
>
> * * *
>
> "Participant" means a person who is eligible for coverage as identified and specified under the terms of the Plan.[55]

The Entergy Plan is governed by ERISA:[56]

> In connection with its fiduciary powers and duties hereunder, Aetna shall observe the standard of care and diligence required of a fiduciary under ERISA Section 404(a)(1)(B).[57]
> * * *
> With respect to any Participant who makes a request for Plan benefits which is denied on behalf of the Customer, Aetna will notify said Participant of the denial and of said Plan Participant's right of review of the denial in accordance with ERISA.[58]
> * * *
> As a Participant in the Entergy Corporation Companies' Benefits Plus Medical Plan you are entitled to certain rights and protections under the

---

[52]  Rec. Doc. No. 27-5, pp. 2, 9, 13, 20–21.Plaintiffs deny this statement as to the dates and contents of the appeal but cite no record evidence in support; Plaintiffs aver the letters did not state "civil action under ERISA § 502(a)," but as quoted, "civil action under ERISA § 502(a), *if applicable*." (emphasis added)."  Rec. Doc. No. 30-1, p. 11.

[53] 3:20-CV-447-SDD-EWD, Rec. Doc. No. 6, p. 1 (quoting Rec. Doc. No. 27-5, p. 24.).  Plaintiffs qualify this statement as will be set forth below.

[54] Rec. Doc. No. 27-5, p. 24.

[55] *Id*. at p. 55.  Plaintiffs' objection as to relevance is OVERRULED.

[56] Plaintiffs object to this statement as irrelevant, which the Court OVERRULES. Rec. Doc. No. 30-1, p. 12.

[57] Rec. Doc. No. 27-5, p. 33.

[58] *Id*. at p. 43.

Employee Retirement Income Security Act of 1974, as amended ("ERISA").[59]

Aetna served as the claims administrator for the Entergy Plan:[60]

> WHEREAS, Customer, on behalf of the Employee Benefits Committee and pursuant to the terms of the Plan, now desires to amend and restate its Prior Services Agreement with Aetna so as to continue to engage the services of Aetna to provide certain administrative services for the Plan in accordance with the terms and conditions set forth in this Services Agreement[.][61]

Aetna contracted with providers to provide services to its Plan Participants at agreed upon rates: "Aetna shall provide Participants with access to Aetna's network hospitals, physicians and other health care providers ("Network Providers") who have agreed to provide services at agreed upon rates and are participating in the Plan covering the Participants."[62]

As to Member 2's first surgery, the Entergy Plan required precertification of certain services:

> As a participant in the Plan, you have the responsibility to:

> Precertify care if you use Out-of-Network Providers for inpatient care or certain alternatives to hospital care.[63]

> To get full benefits from the Plan, your hospital stay must be Precertified. Your Network Provider will handle Precertification for you. However, if an Out-of-Network Physician recommends a hospital stay, you must start the Precertification process yourself by calling Aetna Member Services. If you don't, your benefits will be reduced as described in *Call Member Services for Help with Precertification*.[64]

---

[59] Rec. Doc. No. 27-6, p. 86.
[60] Plaintiffs object to this statement as irrelevant, which the Court OVERRULES. Rec. Doc. No. 30-1, pp. 12-13.
[61] Rec. Doc. No. 27-5, p. 24.
[62] *Id.* at p. 51.  Plaintiffs' relevance objection is OVERRULED.  (Rec. Doc. No. 30-1, p. 13).
[63] Rec. Doc. No. 27-6, p. 9.
[64] *Id.* at p. 37.

On August 9, 2018, Theunissen requested approval from Aetna for the surgery on the August 27, 2018 date of service.[65]  Aetna issued Plaintiffs an out-of-network approval, pre-authorizing the requested services at the out-of-network benefit level under the Entergy Plan:

> This service is approved at an out-of-network benefit level. The provider identified to provide this service does not participate with this plan. The member will be responsible for out-of-network cost-sharing requirements and for any difference between the provider's charge and the amount the plan covers.[66]

The out-of-network approval stated: "Reimbursement will be based on standard coding and bundling logic and any mutually agreed upon contracted or negotiated rates, subject to any and all copays or coinsurance requirements."[67]  The out-of-network approval provided no specific rates for the services.[68]

On August 27, 2018, Plaintiffs, as co-surgeons, performed the surgery on Member 2.[69]  Plaintiffs subsequently submitted claims to Aetna for the surgery on September 18, 2018 and January 3, 4, and 17, 2019.[70]  Aetna separated Plaintiffs' claims to expedite adjudication.[71]  Member 2 was a beneficiary and covered by the Entergy Plan on the dates of service at issue in this litigation.[72]

---

[65] *Id.* at pp. 101-12.

[66] *Id.* at pp. 115-16. Dr. Sadeghi was added to the authorization by phone call from Dr. Theunissen's office to Aetna on August 16, 2018.  *Id.* at p. 153. ("Per Jennifer, another surgeon is also going to be present. I advised Jennifer the other provider will need to call with the codes he/she is going to perform and will need a separate request.").  Plaintiffs attempt to qualify this statement but offer no record evidence in support of their claims.

[67] *Id.* at p. 117. Plaintiffs attempt to qualify this statement but offer no record evidence in support of their claims.

[68] *Id*. at p. 114-34.

[69] 3:20-CV-447-SDD-EWD, Rec. Doc. No. 6, pp. 2–3.

[70] Rec. Doc. No. 27-6, pp. 158, 160, 162, 164.

[71] *Id.*  Plaintiffs offer same qualification as previously for Member 1.

[72] 3:20-CV-447-SDD-EWD, Rec. Doc. No. 6, p. 1; Rec. Doc. No. 27-6, p. 115 (identifying Member 2 as a Plan member and verifying eligibility on the date of service); Rec. Doc. No. 27-9, p. 16 (identifying Member 2 as a Plan member and verifying eligibility on the date of service).

Coverage Approvals: For the services identified above for which coverage has been approved, all three components of coverage approval process have been satisfied:

• Verification of the member's eligibility for coverage under the plan; and
• Verification that the plan provides coverage for the type of services approved (but, has not verified whether any applicable dollar limits under the plan have been exhausted, or will soon be exhausted); and
• Verification that the approved services meet medical necessity criteria.[73]

Aetna paid Plaintiffs' claims pursuant to the terms of the Entergy Plan:

The member's plan provides coverage for charges that are reasonable and appropriate. This procedure has been paid at the reasonable and customary rate which is 25% of the single procedure rate due to multiple surgical procedures performed on the same date of service.[74]

Plaintiffs appealed the benefit determination as ERISA assignees of Member 2.[75]  Aetna claims Plaintiffs' appeals raised the following issues: (1) rate of reimbursement; (2) breach of fiduciary duty by failing to provide an adequate determination notice; (3) continuation of care; and (4) WHCRA violations.[76]  Plaintiffs qualified this statement, countering that their appeal raised additional issues including not limited to those indicated in the Statement: (5) the claims must be paid with interest; and (6) the claim file used to adjudicate the claim must be produced. Plaintiff denies that the first level appeal was submitted as an ERISA assignee of Member 2 and further states that it was submitted as a Designated Authorized Representative of Member 2, not an assignee.[77]

---

[73] *Id*. at p. 117; Rec. Doc. No. 27-9, p. 17.
[74] Rec. Doc. No. 27-6, p. 164. Plaintiffs deny this statement, arguing that "the In-Network Exception Agreement stated: 'This service is approved at an in-network benefit level.['] The EOB referenced in the Statement evidences that Aetna failed to pay Plaintiffs in accordance with this Agreement." Rec. Doc. No. 30-1, p. 17.
[75] Rec. Doc. No. 27-7, p. 12; Rec. Doc. No. 27-8, p. 11. Plaintiffs deny this statement as will be set forth below.
[76] Rec. Doc. No. 27-7, p. 4; Rec. Doc. No. 27-8, p. 4–6.
[77] Rec. Doc. No. 30-3, p. 43; Rec. Doc. No. 30-3, pp. 48–49. Plaintiffs' objection to relevance is OVERRULED.

Document Number: 68818                                                                        16

Plaintiffs requested documents related to the adverse determination, pursuant to

ERISA.[78]

> <u>We Hereby Make Demand to Review Pertinent Documents Related To the [sic] Adverse Determination</u> In order that the member/DAR may fairly evaluate and respond to the claim denials issued herein, they are entitled to and require the entire claim file pertinent to this claim denial, including but not limited to all the items annexed hereto as Exhibit A, including publications, database and schedules used to determine your usual, customary and reasonable charges or "Allowable Amounts" for this plan in accordance with DOL Advisory Opinion 96-14A.[79]
>
> * * *
>
> ERISA Section 503(2) and the accompanying regulations require plans to provide an integral process for the appeal of any benefit claim denial. The review procedure must allow a member/DAR or <u>his designated authorized representative</u> to: (1) Request a review upon written application to the plan; (2) Review pertinent documents, and (3) Submit issues and comments in writing. A claim administrator who relies on internal rules or guidelines in making a decision on a claim must make those rules or guidelines available to the member/DAR with the appeal determination or upon request. 29 C.F.R. § 2560.503-1(g)(1)(v)(A).[80]

After reviewing Plaintiffs' appeal, Aetna upheld the original adjudication of the claims at

the out-of-network level of benefits pursuant to the terms of the Entergy Plan:[81]

> … [W]e are upholding the previous decision to uphold the pricing and payment of the outpatient surgery physician charges.[82]
>
> * * *
>
> … [W]e are standing by our earlier decision to uphold the out-of-network allowed amount that applied….[83]
>
> * * *
>
> … This member's plan allows the 90th percentile of FAIR Health or Ingenix their fee schedule for nonpreferred ("out-of-network") professional providers.[84]

---

[78] Plaintiffs' objection to relevance is OVERRULED.
[79] Rec. Doc. No. 27-8, p. 6.
[80] *Id.* at p. 6 n. 5.
[81] Plaintiffs' relevance objection is OVERRULED.
[82] Rec. Doc. No. 27-8, p. 19.
[83] *Id.* at p. 33.
[84] *Id.* at p. 19.

Document Number: 68818

* * *

We're also standing by our decision on our coverage of the second and subsequent surgeries during the same operative setting. When the same provider bills multiple surgeries, Aetna currently apples the concurrency ratio of 100/50/25 using the relative value units (RVUs) from the Centers for Medicare and Medicaid Services (CMS) Physician Fee Schedule. This means we allow the procedure with the highest RVU at 100 percent, the procedure with the second highest RVU at 50 percent and all subsequent procedures at 25 percent.[85]

* * *

Modifier -62 for a co-surgeon means that the allowable is reduced to 62.5 percent of the recognized charged, to allow for two surgeons. Aetna calculates two surgeons can be allowed 125 percent of the usual rate, and each co-surgeon can be allowed half. Again, this is the allowable amount. The member's plan percentage payment for nonpreferred services was 50 percent of the recognized charge, although her coinsurance limit ("out-of-pocket") was met mid-claim.[86]

* * *

Under the PPO options, you are free to use any health care provider you wish.[87]

* * *

All Out-of-Network benefits are paid based on the Reasonable Charge. A Reasonable Charge is the lower of:

• The provider's usual charge to provide a service or supply; or
• The charge Aetna determines to be the prevailing charge level made for the service or supply in the geographic area where it is provided.[88]

In its appeal decision letter, Aetna notified Plaintiffs of member internal appeal rights if they did not agree with the final decision.[89]  Plaintiffs filed a second-level appeal (as ERISA assignees of Member 2) raising the following issues: (1) continuation of care; (2) WHCRA violations; (3) breach of fiduciary duty by failing to provide an adequate

---

[85] *Id.*
[86] *Id.*
[87] Rec. Doc. No. 27-8, p. 33; Rec. Doc. No. 27-6, p. 24.
[88] Rec. Doc. No. 27-9, p. 20; Rec. Doc. No. 27-8, p. 26.
[89] Rec. Doc. No. 27-8, p. 21; Rec. Doc. No. 27-8, pp. 36. Plaintiffs' relevance objection is OVERRULED.

determination notice;[90] and (4) referencing the first-level member appeal.[91]    Plaintiffs qualify this statement, stating that their appeal raised additional issues including not limited to those indicated in the Statement: (5) the claims must be paid with interest; and (6) the claim file used to adjudicate the claim must be produced. Plaintiffs deny that the second level appeal was submitted as an ERISA assignee of Member 2, and further state that it was submitted as a Designated Authorized Representative of Member 2, not an assignee.[92]

Aetna responded on November 12, 2019 (Theunissen) and May 29, 2019 (Sadeghi) notifying Plaintiffs of member rights if they did not agree with the final decision, including a civil action under ERISA § 502(a):

> With this final decision, the appeal process within Aetna has been completed. Please see the enclosed document, Aetna Appeal Process and Member Rights, for additional rights and for an overview of the entire appeal process.[93]
>
> * * *
>
> If you do not agree with the final decision, you have the right to bring a civil action under Section 502(a) of ERISA, if applicable within two years of the decision.[94]

Plaintiffs deny that the letters state "civil action under ERISA § 502(a)," but as quoted, "civil action under ERISA § 502(a), *if applicable*." Plaintiffs deny that a civil action under ERISA § 502(a) was applicable in this case.[95]

---

[90] Rec. Doc. No. 27-8, pp. 50–51.
[91] *Id.* at pp. 68-69.
[92] Rec. Doc. No. 30-1, pp. 19-20.  Plaintiffs' relevance objection is OVERRULED.
[93] Rec. Doc. No. 27-8, p. 73.
[94] *Id.* at p. 74; Rec. Doc. No. 27-8, p. 90.
[95] Rec. Doc. No. 30-1, p. 20 (emphasis added).

As to Member 2's second surgery, the Entergy Plan required the same precertification of certain services.[96]  Pursuant to Plaintiff's request, [97] Aetna issued Plaintiff Theunissen an In-Network Exception pre-authorizing the requested services at the in-network benefit level under the Entergy Plan.[98]  The In-Network Exception stated that: "Reimbursement will be based on standard coding and bundling logic and any mutually agreed upon contracted or negotiated rates, subject to any and all copays or coinsurance requirements."[99]  The In-Network Exception provided no specific rates for the services.[100]  Plaintiffs deny this statement and contend:  "The In-Network Exception Agreement stated: 'This service is approved at an in-network benefit level.'"[101]

On August 13, 2019, Theunissen performed the surgery on Member 2.[102] Theunissen submitted claims to Aetna for the surgery on October 1, 2019.[103]  Aetna claims it paid Dr. Theunissen's claims for the surgery pursuant to the terms of the Entergy Plan:

> The member's plan provides coverage for charges that are reasonable and appropriate. This procedure has been paid at the reasonable and customary rate which is 25% of the single procedure rate due to multiple surgical procedures performed on the same date of service.[104]
>
> * * *
>
> … This procedure has been paid at 50% of the reasonable and customary rate due to multiple procedures performed on the same date of service.[105]

---

[96] *See supra.* fn 26 & 27.

[97] Rec. Doc. No. 27-9, p. 11.

[98] 3:20-CV-447-SDD-EWD, Rec. Doc. No. 6, p. 5; Rec. Doc. No. 27-9, pp. 16–17. Plaintiffs qualify this statement as set forth below.

[99] Rec. Doc. No. 27-9, p. 18. Plaintiffs qualify this statement noting that this is not the entire passage as set forth in Aetna's Statement No. 15.  Rec. Doc. No. 30-1, p. 21.

[100]  Rec. Doc. No. 27-9, pp. 15–32.

[101] Rec. Doc. No. 30-1, p. 21 (citing Rec. Doc. No. 30-3, pp. 54–57).

[102] 3:20-CV-447-SDD-EWD, Rec. Doc. No. 6, p. 5.

[103]  Rec. Doc. No. 27-9, p. 34. Plaintiffs deny this statement, arguing the received date was not the submission date, but they do not cite to record evidence. Rec. Doc. No. 30-1, p. 6.

[104] *Id.*; Exhibit "17," Entergy Plan, AETNA_000510.

[105] Rec. Doc. No. 27-9, p. 34.

* * *

The member's plan provides benefits for covered expenses at the prevailing charge level made for the service in the geographical area where it is provided. In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas. Prevailing charge is calculated based on any one of the following:

• %tile of Fair Health; or
• Nonparticipating Professional Fee Schedule as elected by the Member's Plan.[106]

Plaintiffs deny that Theunissen was paid in accordance with this agreement.[107]

Aetna claims Theunissen appealed the benefit determination as an ERISA assignee of Member 2.[108]  Plaintiffs deny this claim, arguing that they appealed on behalf of Member 2 as a Designated Authorized Representative, not an assignee.[109]  Plaintiffs further note that the Entergy Plan has an anti-assignment provision.[110]  On appeal, Theunissen raised the following issues: (1) continuation of care; (2) In Network Exception was granted; (3) WHCRA violations; (4) Entergy Plan's definition of "recognized charge;" (5) reimbursement rate; (6) claim reprocessing according to the National Advantage Program (NAP) contract; and (7) requested documents from the Plan Administrator.[111]  Additionally, Theunissen's appeal claimed multiple ERISA violations:

• The notice of adverse benefit determination failed to comply with the requirements of ERISA. 29 C.F.R. § 2560.503-l(g).

• This claim was not processed on a timely basis as required by ERISA and under the Plan. 29 C.F.R. § 2560.503-1 (f).

---

[106] Rec. Doc. No. 27-9, p. 34; Rec. Doc. No. 27-6, p. 97
[107] Rec. Doc. No. 30-1, p. 22.
[108] Rec. Doc. No. 27-9, p. 87.
[109] Rec. Doc. No. 30-3, pp. 48–49.
[110] *Id.* at pp. 72-74.
[111] Rec. Doc. No. 27-9, pp. 38–39. Plaintiffs deny that they appealed as assignees; Plaintiffs' relevance objection is OVERRULED.

Document Number: 68818

• The Claims Administrator engaged in procedural irregularities for the purpose of hindering and/or delaying the processing of this claim. *Abatie v. Alta Health & Life Ins. Co.*, 458 F. 3d 955 (9th Cir. 2006).

• The Claims Administrator under the Plan has several conflicts of interest and has placed its own financial interest ahead of the *Patient. Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

• The Insurance Company purposely narrows its network of providers in an effort to shift costs to plan participants in violation of ERISA.

• The administration of this claim has discriminated against the Patient in violation of Federal and State law.

• The administration of the claim violated applicable State statutory and common law.

• The administration of this claim did not meet the reasonable expectations of the Patient.

• Out-of-network benefits under the Plan are illusory. *Interline Brands, Inc. v. Chartis Specialty Ins. Co.*, 749 F.3d 962, 966-67 (11th Cir. 2014); *Point of Rocks Ranch. LLC v. Sun Valley Title Ins. Co.*, 143 Idaho 411, 146 P.3d 677, 680 (2006).

• Fiduciaries under the Plan did not administer the Plan solely for the benefit of Patient.

• Fiduciaries of the Plan misrepresented the benefits available under the Plan and did not disclose in reasonably clear language, understood by the ordinary person, the limitations of benefits under the Plan. 29 CFR 2520.102-2(a); *Moench v. Robertson*, 62 F. 3d. 553, 566 (3d Cir. 1995).

• Plan Sponsor and/or Plan Administrator violated their fiduciary duties of loyalty and prudence in the selection and ongoing monitoring of Insurance Company. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015); DOL Information Letter to D. Ceresi, 1998 WL I 638068 (Feb. 19, 1998).[112]

Aetna denied Dr. Theunissen's first-level appeal because it was untimely pursuant to the terms of the Entergy Plan:[113]

---

[112] *Id.* at p. 41. Plaintiffs' relevance objection is OVERRULED.

[113] Plaintiffs deny that the first-level appeal was untimely but offer no record evidence to support this claim. Plaintiffs' relevance objection is OVERRULED.  Rec. Doc. No. 30-1, p. 24.

> We received the March 17, 2020, appeal request on April 29, 2020. This request is about the breast surgery services rendered August 13, 2019, by Taylor Theunissen, MD. According to the coverage plan …, members or their authorized representatives have up to 180 calendar days from the date they receive the original notice of an adverse benefit decision to request an appeal. We did not receive this request for an appeal within that time period. Therefore, a review of this appeal will not be conducted and Aetna will consider the original decision to be final.[114]

> * * *

> If you do not agree with the final decision, you have the right to bring a civil action under Section 502(a) of ERISA within two years of the decision.[115]

> * * *

> If your Claim is denied, either in whole or in part, you will receive written (or oral, if applicable) notice of the denial of your Claim for benefits in the form of an Adverse Benefit Determination. You will have the right to appeal an Adverse Benefit Determination within 180 days after you receive the notification of the Adverse Benefit Determination.[116]

Theunissen filed a second-level appeal (as an ERISA assignee of Member 2) raising the following issues: (1) improper denial for no proper authorization; (2) member was not given a full and fair review of claim; and (3) member was not provided with sufficient documentation.[117]   Plaintiffs deny this statement and claim that Theunissen raised additional issues on appeal, and the second level appeal was not submitted as an ERISA assignee of Member 2 but a Designated Authorized Representative.[118]   Subsequently, Theunissen's appeal requested documents related to the adverse benefit determination, pursuant to ERISA.[119]   In response, Aetna notified Theunissen that the appeal process had been exhausted and enclosed the prior untimely appeal notification letter.[120]

---

[114] Rec. Doc. No. 27-9, p. 54.
[115] *Id.*
[116] Rec. Doc. No. 27-6, p. 61.
[117]  Rec. Doc. No. 27-9, pp. 64–66.
[118] Rec. Doc. No. 30-1, p. 24.  Plaintiffs' relevance objection is OVERRULED.
[119] Rec. Doc. No. 27-9, p. 66 n. 4. Plaintiffs' relevance objection is OVERRULED.
[120] Plaintiffs' relevance objection is OVERRULED.

> We received a request for an appeal on May 29, 2020. We have previously performed a full and final investigation of the above issue and advised that our determination was final as it was your last available internal appeal. … We have enclosed our previous response letter that explains our decision and has information about any other additional appeal rights available to you. … Our appeal process has been exhausted.[121]
>
> * * *
>
> If you do not agree with the final decision, you have the right to bring a civil action under Section 502(a) of ERISA within two years of the decision.[122]

Plaintiffs offer the following Counter-Statements of Fact.   Aetna offered Plaintiffs an In-Network Exception Agreement for the September 10, 2018 surgery, in which it promised that the service was approved "at an in-network benefit level." Aetna promised to pay at the in-network benefit level for CPT Codes 19380, 19370, 19361, 19316, 19366, and 19318.[123]  Aetna paid Dr. Sadeghi for performing the September 10, 2018 surgery, albeit insufficiently.[124]  Aetna only declined to pay Dr. Sadeghi for one code that was billed for his work - CPT Code 19316-62 - a code that accounts for a fraction of the doctor's billed charges.[125]  Aetna represented that it based "the eligibility determination" for this code not on an ERISA plan, but "primarily on the assistant surgeon rules of the American College of Surgeons."[126]

Aetna paid Dr. Theunissen for performing the September 10, 2018, surgery, albeit insufficiently. Aetna only declined to pay Dr. Theunissen for one code - 19316-62LT, which accounts for a fraction of the doctor's charges.[127]  Aetna represented that it based "the eligibility determination" for this code not on an ERISA plan, but "primarily on the

---

[121] Rec. Doc. No. 27-9, p. 99.
[122] Rec. Doc. No. 27-9, p. 54; Rec. Doc. No. 27-9, p. 106.
[123] Rec. Doc. No. 30-3, pp. 2–7.
[124] Rec. Doc. No. 30-3, p. 9.
[125] *Id.* at p. 11.
[126] *Id.* at p. 14.
[127] *Id.* at p. 18.

assistant surgeon rules of the American College of Surgeons."[128]  Aetna precertified the September 10, 2018, surgery.[129]

Aetna paid Dr. Sadeghi for the August 27, 2018, surgery, albeit insufficiently.[130] Aetna paid Dr. Theunissen for the August 27, 2018, surgery, albeit insufficiently.[131]  Aetna precertified the August 27, 2018, surgery.[132]  Aetna precertified the August 13, 2019 surgery.[133]

Plaintiffs served as the Designated Authorized Representatives during the internal appeals process for the September 10, 2018, surgery.[134]  Plaintiffs served as the Designated Authorized Representatives during the internal appeals process for the August 27, 2018, surgery.[135]  Theunissen served as the Designated Authorized Representative for the patient during the internal appeals process for the August 13, 2019, surgery, and Aetna paid Theunissen for each CPT Code for that surgery, albeit insufficiently.[136]

Aetna offered Plaintiffs an In-Network Exception Agreement for the August 13, 2019 surgery, in which it promised that the service was approved "at an in-network benefit level." Aetna promised to pay at the in-network benefit level for CPT Codes 19380, 19371, and 19340.[137]  Aetna offered Plaintiffs an In-Network Exception Agreement for the February 5, 2018 and August 27, 2018, surgeries.[138]

---

[128] *Id.* at p. 14.
[129] *Id.* at p. 21.
[130] *Id.* at p. 27.
[131] *Id.* at pp. 29-30.
[132] *Id.* at p. 33.
[133] *Id.* at p. 38.
[134] *Id.* at p. 20.
[135] *Id.* at p. 43.
[136] *Id.* at pp. 48-49.
[137] *Id.* at pp. 54-57.
[138] *Id.* at pp. 59-67.

Exxon: POS II A and POS II B Options SPD states: "The rights or benefits under this Plan may not be assigned by a participant or beneficiary. Any assignment will be treated as a direction to pay benefits to an assignee rather than as an assignment of rights."[139] Entergy Corporation Companies Benefits Plus Medical Plan (amended and Restated as of January 1, 2014) Certificate of Amendment No. 11 states:  "Except to the extent as may be required by applicable law, no benefit payable under the provisions of the Plan or any right available to any participant or beneficiary under ERISA with respect to the Plan shall be subject in any manner to . . .assignment . . . and any attempt to . . . assign . . . shall be void."[140]

Aetna now moves for partial summary judgment seeking dismissal of Plaintiffs' state law claims of breach of contract and detrimental reliance, arguing that they are purely ERISA claims and thus, preempted by ERISA.

## III.    APPLICABLE LAW

### A.    Summary Judgment Standard

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[141] The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact.[142]  A court must deny the motion for summary judgment if the movant fails to meet this burden.[143]

---

[139] *Id.* at p. 70.
[140] *Id.* at pp. 72-74.
[141] Fed. R. Civ. P. 56.
[142] *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).
[143] *Id.*

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."[144] This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim.[145] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[146]

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment.[147] The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.[148]   Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party.[149]

**B.  ERISA Preemption**

"Congress enacted the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*., to provide federal standards for the establishment and maintenance of employee pension and benefit plans."[150] A central purpose in Congress' enacting ERISA was to prevent the "great personal tragedy" suffered by employees whose vested retirement benefits are not paid when pension plans are terminated.[151] "In short, Congress wanted to insure that when an employer promised an

---

[144] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted).
[145] *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990).
[146] *Anderson*, 477 U.S. at 249 (citations omitted).
[147] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).
[148] *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000).
[149] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).
[150] *Musmeci v. Schwegmann Giant Super Markets*, 159 F. Supp.2d 329, 340 (E.D. La. 2001)(citing *Williams v. Wright*, 927 F.2d 1540, 1543 (11th Cir.1991)).
[151] *Id.* (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 374–75 (1980)(quoting 3 Leg. Hist. 4793, Senator Bentsen)).

employee a pension benefit upon retirement, and the employee fulfilled whatever conditions were required to obtain the benefit, that he actually received it."[152]  Thus, "ERISA was designed to be remedial legislation meriting a liberal construction in favor of protecting participants' interests in employee benefit plans."[153]

Federal law may, in some instances, occupy a particular area of law so completely that "any civil complaint raising this select group of claims is necessarily federal in character."[154] When this happens, the state law claim is "completely preempted" and "presents a federal question" that "provides grounds for a district court's exercise of jurisdiction upon removal," regardless of the well-pleaded complaint rule.[155] "ERISA provides one such area of complete preemption."[156]

The Supreme Court discussed the scope of ERISA's complete preemption in *Aetna Health Inc. v. Davila*,[157] wherein the Court held that a state law claim falls within the scope of ERISA and is completely preempted "if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and ... there is no other independent legal duty that is implicated by a defendant's actions."[158]  In other words, the purported state law claim is completely preempted if "the individual is entitled to such coverage only because of the terms of an ERISA-regulated employee benefit plan, and ... no legal duty (state or federal) independent of ERISA or the plan terms is violated."[159] Discussing *Davila*, the district court for the Eastern District of Louisiana explained:

---

[152] *Id*. (citing *Nachman Corp*., 446 U.S. at 375).

[153] *Id*. (citing *Smith v. CMTA–IAM Pens. Trust*, 746 F.2d 587, 589 (9th Cir.1984)).

[154] *Giles v. NYLCare Health Plans, Inc*., 172 F.3d 332, 336 (5th Cir.1999)(quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 64–65 (1987)).

[155] *Id*. at 337.

[156] *McAteer v. Silverleaf Resorts, Inc*., 514 F.3d 411, 416 (5th Cir.2008).

[157] 542 U.S. 200 (2004).

[158] *Id*. at 210.

[159] *Id*.

Whether a third-party health care provider's claims are completely preempted by ERISA depends on precisely what rights the provider seeks to enforce and what duty it alleges has been breached. *See Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1346–47 (11th Cir.2009). One possibility is that a third-party health care provider can seek to enforce its patient's rights to reimbursement pursuant to the terms of the ERISA plan, in a derivative capacity pursuant to an assignment of the patient's rights. That kind of derivative claim is completely preempted by ERISA. *Id.* at 1347. On the other hand, if a health care provider can assert a right to payment based on some separate agreement between itself and an ERISA defendant (such as a provider agreement or an alleged verification of reimbursement prior to providing medical services), that direct claim is not completely preempted by ERISA. *See id.* at 1346–47; *accord Intra–Operative Monitoring Svcs., Inc. v. Humana Health Benefit Plan of La., Inc.*, No. 04–2621, 2005 WL 1155847 (E.D.La. May 5, 2005). A health care provider may also have both a valid assignment of its patient's rights and a direct claim arising under state law and can elect to assert either or both of those claims. *Conn. State Dental Ass'n*, 591 F.3d at 1347. In that third situation, the mere existence of an assignment of the patient's rights under the ERISA plan is jurisdictionally irrelevant so long as the provider is not actually seeking to enforce that derivative claim. *See Intra–Operative Monitoring Svcs.*, 2005 WL 1155847, at *2.[160]

Complete preemption is distinct from conflict preemption.[161] While complete preemption is jurisdictional and confers federal question jurisdiction, "conflict preemption serves as a defense to a state action."[162] Further, "[c]omplete preemption makes a purportedly state-law cause of action inherently federal; there is no way to 'forego' bringing it as a federal claim … A party cannot simply change the label of a claim and thereby bring it out of the scope of ERISA complete preemption."[163]

Where claims are not completely preempted, conflict preemption still may be applicable under ERISA § 514(a)'s[164] "broad preemption provision[,] ... which preempts

---

[160] *Center for Restorative Breast Surgery, L.L.C. v. Humana Health Benefit Plan of Louisiana*, No. 10-4346, 2011 WL 1103760, at *2 (E.D. La. Mar. 22, 2011).
[161] *See Arana v. Ochsner Health Plan*, 338 F.3d 433, 437 (5th Cir. 2003).
[162] *Giles*, 172 F.3d at 337.
[163] *Center for Restorative Breast Surgery, L.L.C*, 2011 WL 1103760, at *4.
[164] Employee Retirement Income Security Act, 29 U.S.C. § 1144.

state laws which 'relate to' an ERISA benefit plan."[165]   "However, unlike complete preemption, conflict preemption does not establish federal question jurisdiction because 'conflict preemption serves as a defense to a state action.'"[166]   The Fifth Circuit has held that:

> [w]hen the doctrine of complete preemption does not apply, but the plaintiff's state claim is arguably preempted under § 514(a), the district court, being without removal jurisdiction, cannot resolve the dispute regarding preemption. It lacks power to do anything other than remand to the state court where the preemption issue can be addressed and resolved.[167]

Plaintiffs argue Aetna's motion should be denied on the grounds that ERISA preemption is an affirmative defense that is waived if not pled.  Because Aetna failed to assert ERISA preemption as an affirmative defense in the *Answers* filed in these matters, this defense is waived.  Plaintiffs rely on the Fifth Circuit's decision in *Dueringer v. Gen. Am. Life Ins. Co*., wherein the court held that the insurance company, who lost the case after trial, could not raise ERISA preemption on appeal for the first time.[168]

Aetna counters that Plaintiffs have conflated complete preemption and conflict preemption, and since this case involves complete preemption under ERISA § 502, such a defense is not waivable.  Alternatively, Aetna points to the affirmative defenses asserted in its *Answers*,[169] which pertain to ERISA governance.  Specifically, affirmative defense no. 18 states "… Defendant is not certain which affirmative defenses may apply to this matter until this matter proceeds to trial. Defendant reserves all additional defenses

---

[165] *Anderson v. Electronic Data Sys. Corp., et al*., 11 F.3d 1311, 1313 (5th Cir.1994).
[166] *Chandler v. HUB Intern. Midwest, Ltd.*, No. 14-2108, 2015 WL 915345, at *4 (E.D. La. Mar. 2, 2015)(quoting *Giles*, 172 F.3d at 337).
[167] *Giles*, 172 F.3d at 337.
[168] 842 F.2d 127 (5th Cir. 1988). Plaintiffs cite several cases from other circuits and districts that purportedly support this argument. Rec. Doc. No. 30, pp.15-16.
[169] Rec. Doc. No. 17, pp. 3–4; 3:20-CV-447-SDD-EWD, Rec. Doc. No. 15, pp. 3–4.

available under the Plan, under the terms of ERISA, and based on further investigation…."[170]

While the determination of whether the claim at issue in this motion is completely preempted or conflict preempted under ERISA must be resolved on the merits, as will be set forth below, the Court finds that Aetna has demonstrated that it has asserted the appropriate affirmative defenses under the conflict preemption scenario.  Additionally, while Plaintiffs argue that the ERISA Plans are irrelevant to their state law breach of contract claim in these lawsuits, it appears undisputed that the Plans by which Member 1's and Member 2's surgeries were approved are governed by ERISA.

### C. Third Party Providers and ERISA, Generally

As Plaintiffs correctly claim, many courts have distinguished the rights of third-party providers under ERISA, explaining that that they are not traditional ERISA entities subject to broad preemption.  The Fifth Circuit, in *Memorial Hospital System v. Northbrook Life Insurance Company*, explained two unifying characteristics of cases finding ERISA preemption of a plaintiff's state law causes of action.[171]  In *Memorial Hospital*, the Fifth Circuit instructed that plaintiffs' state law causes of action have been found to be preempted when: (1) the state law claim addresses areas of exclusive federal concern, and (2) the claim directly affects the relationship between traditional ERISA entities - the employer, the plan and its fiduciaries, and the participants and beneficiaries.[172]

Following *Memorial Hospital*, preemption is first appropriate where the state law addresses areas of exclusively federal concern, including the right to receive benefits

---

[170] Rec. Doc. No. 17, p. 4; 3:20-CV-447-SDD-EWD, Rec. Doc. No. 15, pp. 4.
[171] 904 F.2d 236, 245 (5th Cir.1990).
[172] *Id.*

under the terms of an ERISA plan.[173]  Congress' purpose in enacting ERISA was "to promote the interests of employees and their beneficiaries in employee benefit plans, ... and to protect contractually defined benefits."[174] The Supreme Court cautioned, however, that it has "addressed claims of [ERISA] pre-emption with the starting presumption that Congress [did] not intend to supplant state law."[175] "Lawsuits against ERISA plans for commonplace, run-of-the-mill state-law claims - although obviously affecting and involving ERISA plans - are not preempted by ERISA."[176]

Preemption is also appropriate when the state law directly affects the relationship among the traditional ERISA entities - the employer, the plan and its fiduciaries, and the participants and beneficiaries.[177]  For example, a hospital's state law claims for breach of fiduciary duty, negligence, equitable estoppel, breach of contract, and fraud are preempted by ERISA when the hospital seeks to recover benefits owed under a plan to a plan participant who has assigned her right of benefits to the hospital.[178] However, without an assignment from a plan participant/beneficiary, health care providers are not considered traditional ERISA entities.[179]  Considering these general principles regarding third-party providers and ERISA, the Court turns to the *Davila* test.

---

[173] *Id.*

[174] *Firestone Tire & Rubber Company v. Bruch*, 489 U.S. 101, 113 (1989) (internal citations and quotations omitted).

[175] *New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Insurance Company*, 514 U.S. 645, 654 (1995); *see also Fort Halifax Packing Company, Inc. v. Coyne*, 482 U.S. 1, 19 (1987)("ERISA preemption analysis 'must be guided by respect for the separate spheres of governmental authority preserved in our federalist system.'")).

[176] *Memorial Hermann Hosp. Systems v. Aetna U.S. Healthcare*, No. H-05-0004, 2006 WL 1697646, at *2 (S.D.Tex. June 12, 2006)(citing *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 833 (1988)).

[177] *Mem'l Hosp. Sys. v. Northbrook Life. Ins. Co.*, 904 F.2d 236, 245 (5th Cir. 1990).

[178] *See Hermann Hospital v. MEBA Medical & Benefits Plan*, 845 F.2d 1286, 1290 (5th Cir.1988).

[179] *Memorial Hospital*, 904 F.2d at 249 (stating that health care providers were not a party to the ERISA bargain struck by Congress between health benefit plans and their participants).

D. *Davila* Test

1. Could Claim Have Been Brought under § 502(a)

In determining whether Plaintiffs' breach of contract and detrimental reliance claims are completely preempted, the Court must first determine whether Plaintiffs could have brought these claims under ERISA § 502(a). Importantly, ERISA does not preempt "[a] state law claim ... [that] does not affect the relations among the principal ERISA entities (the employer, the plan fiduciaries, the plan, and the beneficiaries)."[180] Plaintiffs herein are not participants or beneficiaries of an ERISA plan; thus, they lack independent standing to assert a claim for recovery under ERISA.[181] However, when a participant or beneficiary assigns his/her right to receive benefits under an ERISA plan to a third-party, that third-party may bring a derivative action to enforce an ERISA plan beneficiary's claim.[182]

In *Crescent City Surgical Centre v. United Healthcare of La., Inc.*, the Eastern District of Louisiana explained:

> Addressing the issue of ERISA preemption of third-party health care providers' claims against out-of-network insurers, the courts of this district have adopted an approach by which they consider "precisely ... what rights the provider seeks to enforce and what it alleges has been breached." Crescent City Surgical Ctr. v. Humana Health Benefit Plan of Louisiana, Inc., 2019 WL 4387152 (E.D. La. Sept. 13, 2019) (quoting Center for Restorative Breast Surgery, L.L.C. v. Humana Health Benefit Plan of Lousiana, Inc., 2011 WL 1103760, at *2 (E.D. La. Mar. 22, 2011)(citation omitted)). "One possibility is that a third-party health care provider can seek to enforce its patient's rights to reimbursement pursuant to the terms of the ERISA plan, in a derivative capacity pursuant to an assignment of the patient's rights." Center for Restorative Breast Surgery, 2011 WL 1103760, at *2. In that case, the claim is a derivative one and completely preempted

---

[180] *Perkins v. Time Ins. Co.*, 898 F.2d 470, 473 (5th Cir. 1990).
[181] *See Mem'l Hosp. Sys.*, 904 F.2d at 249 (5th Cir.1990) (citing *Hermann Hosp. v. MEBA Med. & Benefits Plan*, 845 F.2d 1286, 1290 (5th Cir.1988)).
[182] *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Employee Health Care Plan*, 426 F.3d 330, 333-34 (5th Cir. 2005).

by ERISA. Id. In contrast, "if a health care provider can assert a right to payment based on some separate agreement between itself and an ERISA defendant (such as a provider agreement or an alleged verification of reimbursement prior to providing medical services), that direct claim is not completely preempted by ERISA." Id. (citations omitted). Thus, "a health care provider may also have both a valid assignment of its patient's rights and a direct claim arising under state law and can elect to assert either or both of those claims." Id. (citations omitted). Under that scenario, "the mere existence of an assignment of the patient's rights under the ERISA plan is jurisdictionally irrelevant so long as the provider is not actually seeking to enforce that derivative claim." Id.[183]

Here, the Parties dispute whether Member 1 and Member 2 validly assigned their rights to Plaintiffs. Aetna presents evidence of assignments obtained by both Members,[184] which Plaintiffs relied upon in appealing Aetna's benefits determinations under the Plans.[185]  Plaintiffs raised several ERISA-related arguments in their appeals.[186]  Plaintiffs fully exhausted the appeals under the Plans, based both on the assignments obtained from the Members and as designated authorized representatives.[187]   Thus, Aetna argues, as assignees of the Plan beneficiaries, the Plaintiffs could have brought these claims under ERISA § 502(a)(1)(B).  Citing *Spring E.R., LLC v. Aetna Life Ins. Co.*,[188] Aetna argues that:

> Allowing Plaintiffs to hold themselves out as assignees of ERISA benefits such that they could avail themselves the entirety of the administrative appeal process but escape ERISA entirely when attempting to collect benefits under the Plans simply by not pleading the fact that the

---

[183] No. 19-12586, 2019 WL 6112706, *2 (E.D. La. Nov. 18, 2019).
[184] Rec. Doc. No. 27-2, p. 13, 36; Rec. Doc. No. 27-7, p. 12; Rec. Doc. No. 27-8, p. 11; Rec. Doc. No. 27-9, p. 87.
[185] Rec. Doc. No. 27-2, pp. 2–22, 24–46; Rec. Doc. No. 27-7, pp. 2–20; Rec. Doc. No. 27-8, pp. 2–16; Rec. Doc. No. 27-9, pp. 62–96.
[186] Rec. Doc. No. 27-2, pp. 2–22, 24–46; Rec. Doc. No. 27-7, pp. 2–20; Rec. Doc. No. 27-8, pp. 2–16; Rec. Doc. No. 27-9, pp. 36–51, 62–96.
[187] Rec. Doc. No. 27-5, pp. 2–10, 12–22; Rec. Doc. No. 27-9, pp. 98–113.
[188] No. CIV.A. H-09-2001, 2010 WL 598748, at * 4 n. 3 (S.D. Tex. Feb. 17, 2010)(the court noted that, allowing a plaintiff "to hold itself out as an assignee of ERISA benefits such that it could receive direct payments from insurance companies, but escape ERISA entirely when attempting to collect these payments, simply by stating that it never actually received such assignments ... [would] be illogical and run contrary to the interests of justice.").

assignments exist would be illogical and run contrary to the interests of justice.[189]

Thus, Aetna contends the first prong of *Davila* is satisfied.

Plaintiffs counter that they are asserting their own claims for breach of contract and detrimental reliance and do not rely on assignments from their patients in bringing this lawsuit. Plaintiffs cite a wealth of jurisprudence supporting the policy behind allowing a third-party provider to bring individual claims against ERISA Plans.[190] Plaintiffs also claim that both the Exxon Plan and the Entergy Plan contain anti-assignment provisions;[191] thus, any assignment by these patients was invalid, Plaintiffs lack standing to bring ERISA claims, and prong one of *Davila* is not satisfied.

Aetna rebuts Plaintiffs' argument that they were not assignees, considering that both relied on said assignments in the ERISA appeals process. Aetna argues that this lawsuit "is simply a continuance of the ERISA appeal procedures."[192] According to Aetna, Plaintiffs' attempts to now classify themselves as "designated authorized representatives" of the patients cannot undo Plaintiffs' previous acknowledgement that they are assignees. Aetna notes that Plaintiffs' appeals asserted their standing as assignees and requested that all reimbursements be sent to them directly.[193] Aetna again cites *Spring* wherein the court held: "Because Plaintiff has repeatedly held itself out as an assignee of benefits under the relevant ERISA health plans, both circumstantially and in writing, and it presents no evidence … that it never actually received such assignments, the evidence

---

[189] Rec. Doc. No. 24-1, p. 21.
[190] Rec. Doc. No. 30, pp. 17-18 (citations omitted).
[191] Rec. Doc. No. 30-3, pp. 70, 73
[192] Rec. Doc. No. 34, p. 2.
[193] Rec. Doc. No. 24-1, p. 20. *See* Rec. Doc. No. 27-2, pp. 2–22, 24–46; Rec. Doc. No. 27-4, pp. 2–33, 35–54; Rec. Doc. No. 27-7, pp. 2–20; Rec. Doc. No. 27-8, pp. 2–16, 48–66, 68–69; Rec. Doc. No. 27-9, pp. 36–51, 62–96.

strongly suggests that it would have the standing to bring an ERISA suit."[194]  Aetna insists Plaintiffs represented that they held assignments from their patients in completing Boxes 12, 13, and 27 on the forms;[195] thus, the Court should reject Plaintiffs' contrary position now.

The Court agrees that Plaintiffs cannot have their cake and eat it, too. It is disingenuous at best to now claim that the assignments obtained from their patients could not have been valid based on the Plans' anti-assignment provisions after Plaintiffs presented evidence of the purportedly valid assignments, which Aetna accepted, and then utilized the administrative appeals process under the Plans partly on that basis. Indeed, the exhibits upon which Plaintiffs rely in arguing that they were designated authorized representatives clearly demonstrate that Plaintiffs acknowledged that they were **both assignees and** designated authorized representatives.  Plaintiffs' exhibit 6 reads: "Please be advised that Dr. Sadeghi is both an assignee and the designated authorized representative of patient … Attached is an Assignment of Benefits/Designation of Authorized Representative  from  [patient] to the providers …"[196]  Plaintiffs' exhibits 11 and 12 both start by referring to Dr. Theunissen as "the assignee and designated authorized representative of [patient] … Attached are the requisite authorization, assignment, and HIPAA forms.[197]  Moreover, Plaintiffs do not demonstrate how the anti-

---

[194] *Spring*, 2010 WL 598748, at *4.

[195] Rec. Doc. No. 27-2, pp. 2–22, 24–46; Rec. Doc. No. 27-4, pp. 2–33, 35–54; Rec. Doc. No. 27-7, pp. 2–20; Rec. Doc. No. 27-8, pp. 2–16, 48–66; Rec. Doc. No. 27-9, pp. 62–96. See also Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, Center for Medicare & Medicaid Servs (Sept. 4, 2020), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c26pdf.pdf.

[196] Rec. Doc. No. 30-3, p. 20.

[197] Rec. Doc. No. 30-3, pp. 43-44, 48-49.

Document Number: 68818

assignment provisions may, or may not, apply to their specific claims, nor do they offer the Court any jurisprudence on the issue.

Nevertheless, finding that Plaintiffs received and relied upon valid assignments from their patients to pursue the ERISA Plans' appeal process does not end the inquiry. As set forth above, as held in *Center for Restorative Breast Surgery*,

> A health care provider may also have both a valid assignment of its patient's rights and a direct claim arising under state law **and can elect to assert either or both of those claims** … In that third situation, the mere existence of an assignment of the patient's rights under the ERISA plan is jurisdictionally irrelevant so long as the provider is not actually seeking to enforce that derivative claim.[198]

Accordingly, the Court turns to the second prong of *Davila* having found that the first prong is satisfied by the undisputed evidence in this case.

2.   <u>Independent Legal Duty</u>

To establish complete preemption the Court must also find that no independent legal duty is implicated by Aetna's actions.[199] A claim implicates an independent legal duty when the individual may bring the state law claim regardless of the terms of an ERISA plan.[200]

Plaintiffs argue that the In-Network Exception letters provided by Aetna constitute separate agreements independent of the ERISA claims that may exist.  Plaintiffs also claim they relied to their detriment on the In-Network Exceptions wherein Aetna promised to pay Plaintiffs an in-network rate.  Aetna argues that it has no independent legal duty to Plaintiffs outside the terms of the Plans.

---

[198] *Center for Restorative Breast Surgery*, 2011 WL 1103760 at *2 (emphasis added).
[199] *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004).
[200] *See id*. at 213.

Aetna claims Plaintiffs have failed to demonstrate that a separate contract exists outside the Plans.  Specifically, Aetna contends that Plaintiffs seek to recover benefits under the Plans, *i.e.*, their claims implicate the right to payment because the alleged underpayments are not underpayments but, rather, coverage denials of benefit determinations under the Plans.

Aetna contends the In-Network Exceptions do not guarantee that the services would be covered; rather, they only specified that the member was eligible, that the Plans provided coverage for the requested services, and that the services met the medical necessity criteria under the Plans.[201]  Notably, validity of the In-Network Exceptions was specifically conditioned upon, *inter alia*, coverage under the Plans: "This coverage approval is NOT effective and benefits may not be paid if: … the approved procedures or services are not covered due to … an exclusion under the plan."[202] Additionally, the Plans state that pre-certification or prior approval is not a guarantee of payment.[203]

Aetna maintains that Plaintiffs' challenge requires a determination of whether the co-surgeon services were covered considering the co-surgeon exclusion, whether the

---

[201] Rec. Doc. No. 27-1, p. 120; Rec. Doc. No. 27-9, p. 17.
[202] Rec. Doc. No. 27-1, p. 120; Rec. Doc. No. 27-9, p. 17.
[203] The Exxon Plan provides: "A pre-determination is an estimate of covered services and benefits payable in advance of treatment. It is not a guarantee of benefits eligible or payment amount." Rec. Doc. No. 27-1, p. 43. "A written pre-determination request will result in a detailed response as to whether a … service is covered under the … Plan and whether the proposed cost is within reasonable and customary limits…. …[A] pre-determination, either verbal or written, is not a guarantee of payment, as claims are paid based on the actual services rendered and in accordance with Plan provisions." *Id.* at p. 103.
The Entergy Plan provides: "The prior approval of a Pre-Service Claim does not guarantee payment or assure coverage; it means only that the information furnished … indicates that the requested … treatment is Medically Necessary…. A Pre-Service Claim receiving prior approval … must still meet all other coverage terms, conditions and limitations for payment. Coverage for any such Pre-Service Claim receiving prior approval may still be limited or denied after the care or treatment is completed and a Post-Service Claim is filed if: (1) a benefit exclusion or limitation applies, … (4) Out-of-Network limitations apply, or (5) any other limitation or exclusion in the Plan applies to limit or exclude the Claim." Exhibit "17," Entergy Plan, AETNA_000480. "… Precertification does not guarantee that any particular Claim will be paid. All Claims are subject to all Plan rules, including Deductibles, Coinsurance, maximums, Reasonable Charge and Medical Necessity limitations." *Id.* at AETNA_000472.
Document Number: 68818

appropriate network level of Plan benefits was applied, and whether the benefits were calculated according to Plan terms.  Thus, Plaintiffs' claims are based directly on coverage determinations under the Plans, not a provider agreement or separate contract distinct from the Plans.  Because the underlying question of whether a service is covered under ERISA depends solely on the Plans, Plaintiffs' claims relate to the ERISA Plans and are preempted.

Aetna argues that this is a right to payment rather than a rate of payment case, and Plaintiffs' right to payment has not been established. Aetna contends Plaintiffs' claims challenge Aetna's denials of reimbursement because the services were not covered by the Plans, and the application of the correct level of benefits (in-network versus out-of-network), required interpretation of the Plans.  Further, Aetna denied Plaintiffs' claims as co-surgeons and determined coverage for specified procedures based on provisions in the Plans.[204]

The In-Network Exceptions establish that Aetna will pay Plaintiffs for "Medically Necessary" "Covered Services" at the "in-network benefit level" as calculated under the ERISA Plans.[205] Thus, Aetna maintains the determination of what is a covered benefit and the calculation of benefits require interpretation of the ERISA Plans. There is no separate agreement between Plaintiffs and Aetna – all terms at issue arise under the ERISA Plans.[206]

Further, Aetna argues that, while Plaintiffs claim that the in-network level of benefits should have been applied to the claims,[207] Plaintiffs fail to acknowledge that the

---

[204] Rec. Doc. No. 27-1, pp. 166, 168, 170; Rec. Doc. No. 27-6, p. 164; Rec. Doc. No. 27-9, p. 34.
[205] Rec. Doc. No. 27-1, pp. 116–137; Rec. Doc. No. 27-9, pp. 15–32.
[206] Rec. Doc. No. 24-1, p. 28.
[207] Rec. Doc. No. 6, p. 7; 3:20-CV-447-SDD-EWD, Rec. Doc. No. 6, p. 7.

Plans dictate the application of in-network versus out-of-network benefits and how benefits are calculated. Aetna cites to both the Exxon Plan and the Entergy Plan which explain these calculations.[208]  Aetna contends that, because "[t]he Fifth Circuit has made clear that claims that concern 'any determination of benefits under the terms of a plan – i.e., what is "medically necessary" or a "[c]overed [s]ervice' – do[] fall within ERISA,'"[209] the determination of what is a covered benefit and the calculation of benefits requires interpretation of the ERISA Plans.  Aetna argues that Plaintiffs' claims "plainly arise out of coverage determinations under ERISA Plans," and, pursuant to *Lone Star*, "a determination of benefits under the terms of a Plan, such as what constitutes a 'Covered Service,' is a right to payment dispute, as opposed to a rate of payment."[210]

Plaintiffs counter that their claims in this case are not based on the Plans but on written promises and misrepresentations entirely outside the Plans' provisions.  Plaintiffs also contend Aetna's reliance on *Spring* is misplaced because, even if there were valid assignments from their patients, Plaintiffs are not bringing claims pursuant to such assignments.

Further, Plaintiffs contend the evidence has established their basic right to payment.  For the three surgeries at issue in this case: September 10, 2018, August 27, 2018, and August 13, 2019, Plaintiffs claim that Aetna covered the surgeries and paid Plaintiffs for all three, although they were under-reimbursed for all three.[211] Aetna covered and paid both surgeons for all CPT Codes billed for the August 27, 2018, surgery.[212]  In

---

[208] Rec. Doc. No. 27-1, pp. 68, 72, 106; Rec. Doc. No. 27-6, p. 24.
[209] Rec. Doc. No. 24-1, p. 28 (quoting *Lone Star OB/GYN Assocs. v. Aetna Health Inc.*, 579 F.3d 525, 531 (5th Cir. 2009)).
[210] *Id.* (quoting *Lone Star*, 579 F.3d at 531).
[211] Rec. Doc. No. 30-1, pp. 26–27.
[212] *Id.*

some of the denials, Plaintiffs contend Aetna did not rely on an ERISA Plan in making eligibility determinations, but "primarily on the assistant surgeon rules of the American College of Surgeons."[213]  Thus, Plaintiffs argue the claims that do not implicate coverage determinations under the Plan are not preempted.[214]  Plaintiffs cite *Sarasota County Public Hospital Board v. Blue Cross and Blue Shield*, wherein the district court for the Middle District of Florida held that ERISA does not preempt when "the extent of a plan's coverage for the plaintiff's services and the correctness of the defendants' coverage determinations are largely immaterial to adjudicating the plaintiff's claims."[215]

Plaintiffs point to the language in the In-Network Exceptions wherein Aetna states that the service was approved "at an in-network benefit level."[216]  Plaintiffs cite *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co*., in which the court held that determining "in-network payment rates … [does] not entail 'the sort of exacting, tedious, or duplicative inquiry that the preemption doctrine is intended to bar.'"[217]  Plaintiffs insist that, as third party providers, seeking payment that was promised "is not a domain of behavior that Congress intended to regulate with the passage of ERISA."[218]  Plaintiffs also rely on the decision by the Eastern District of Louisiana in *Crescent City Surgical Ctr. v. Cigna Health & Life Ins. Co*., where the court held that: "If a health care provider can assert a right to payment based on some separate agreement between itself and an ERISA defendant (such as a provider agreement or an alleged verification of reimbursement prior to

---

[213] Rec. Doc. No. 30-3, pp. 2–7.
[214] *See Lone Star*, 579 F.3d at 533.
[215] 511 F.Supp. 3d 1240, 1248 (M.D. Fla. 2021)(citations omitted).
[216] Rec. Doc. No. 30-3, pp. 2–7.
[217] 967 F.3d 218, 234 (3d Cir. 2020).
[218] *Access Mediquip L.L.C. v. UnitedHealthCare*, 662 F.3d 376, 385-86 (5th Cir. 2011).

providing medical services), that direct claim is not completely preempted by ERISA."[219]

Plaintiffs further rely on the Fifth Circuit's decision in *Kelsey-Seybold Med. Grp. PA v. Great-West Healthcare of Tex., Inc.*, wherein the Court held: "[W]here claims do not involve coverage determinations, but have already been deemed 'payable,' and the only remaining issue is whether they were paid at the proper contractual rate, ERISA preemption does not apply."[220]

      In reply, Aetna counters Plaintiffs' argument that Aetna did not base its co-surgeon eligibility determination on the Plans but primarily on the assistant surgeon rules of the American College of Surgeons, quoting the precise language of the Plans:

> Medically necessary
> When determining medical necessity, the Administrator-Benefits may consider the Clinical Policy Bulletins (CPBs) published by Aetna…. CPBs are based on established, nationally accepted governmental and/or professional society recommendations, as well as other recognized sources....[221]

> Medically Necessary or Medical Necessity
> Health care services and supplies that are determined by the Claims Administrator to be medically appropriate, and: … Consistent in type, frequency and duration of treatment with scientifically-based guidelines of national medical, research or health care coverage organizations or governmental agencies that are accepted by the Claims Administrator[.][222]

Further, Aetna contends that its coverage determinations were in accordance with the Plans terms that "a co-surgeon would not be considered medical [sic] necessary either."[223]   Aetna insists that "[c]overage decisions based on medical necessity are

---

[219] No. 10-4346, 2011 WL 1103760, *2 (E.D. La. Mar. 22, 2011).
[220] 611 F. App'x 841, 841-42 (5th Cir. 2015)(cleaned up).
[221] Rec. Doc. No. 27-1, p. 41.
[222] Rec. Doc. No. 27-6, p. 94.
[223] Rec. Doc. No. 27-3, pp. 2–10, 12–20.

determined under the Plans and implicate the right to payment – not the rate of payment.[224]

As to co-surgeon coverage, Aetna quotes the documents and states that the In-Network Exceptions do not extend a coverage inclusion for a co-surgeon: "We use nationally recognized clinical guidelines and resources, such as MCG criteria and Clinical Policy Bulletins available at http://www.aetna.com/cpb/cpb_menu.html, as well as plan benefit documents to support these coverage decisions."[225]   Thus, Aetna contends, Plaintiffs' argument about reference to guidelines from the American College of Surgeons is meritless because the In-Network Exceptions point directly to the language used in the Plans for calculation of payments.

## Breach of Contract and Detrimental Reliance[226]

---

[224] Rec. Doc. No. 34, p. 5 (citing *Lone Star*, 579 F.3d at 531).

[225] Rec. Doc. No. 27-1, pp. 116–137; Rec. Doc. No. 27-6, pp. 114–134; Rec. Doc. No. 27-9, pp. 15–32.

[226] In *Durio v. Metropolitan Life Ins. Co.*, 653 F.Supp.2d 656, 666 (W.D. La. 2009), the Louisiana Western district court explained:

 A cause of action for detrimental reliance is codified at Louisiana Civil Code article 1967. Article 1967 provides: "Cause is the reason why a party obligates himself. A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable." La. Civ.Code art.1967 (2008). A claim under this provision is based on promissory estoppel, not tort. *Stokes v. Georgia–Pacific Corp.*, 894 F.2d 764, 770 (5th Cir.1990) (detrimental reliance claim is not based on tort).

"'The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence.' *Suire v. Lafayette City–Parish Consol. Gov't,* 907 So.2d 37, 59 (La.2005).   'To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance.' *Id.* Significantly, to prevail on a detrimental reliance claim, Louisiana law does not require proof of a formal, valid, and enforceable contract. Id. Under Louisiana law, 'the focus of analysis of a detrimental reliance claim is not whether the parties intended to perform, but, instead, whether a representation was made in such a manner that the promisor should have expected the promisee to rely upon it, and whether the promisee so relies to his detriment.' *Id.*" *Audler v. CBC Innovis Inc.* 519 F.3d 239, 254 (5th Cir.2008).

The In-Network Exception letters are clearly pre-authorizations or pre-procedure verifications of coverage at an in-network benefit level (and one out-of-network verification) for the services provided by Plaintiffs.  Numerous courts have held that a pre-authorization or verification of coverage can constitute a independent legal duty outside the scope of ERISA.   "If a health care provider can assert a right to payment based on some separate agreement between itself and an ERISA defendant (**such as a provider agreement or an alleged verification of reimbursement prior to providing medical services**), that direct claim is not completely preempted by ERISA."[227]   Further, "a provider's claims are not preempted just because it could recover an amount equal to the amount of benefits a patient could recover under the ERISA plan."[228]  The court in *Omega Hosp., L.L.C. v. Aetna Life Ins. Co.* explained: "Courts have consistently held that claims of detrimental reliance and breach of contract for failure to pay after verification of benefits implicate independent legal duties that are not preempted by ERISA." [229]

---

[227] *Center for Restorative Breast Surgery, L.L.C. v. Humana Health Benefit Plan of Louisiana*, No. 10-4346, 2011 WL 1103760 at *2 (E.D. La. Mar. 22, 2011)(citing *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1346–47 (11th Cir. 2009); *accord Intra–Operative Monitoring Svcs., Inc. v. Humana Health Benefit Plan of La., Inc.*, No. 04–2621, 2005 WL 1155847 (E.D.La. May 5, 2005))(emphasis added); *Crescent City Surgical Centre v. Humana Health Benefit Plan of Louisiana, Inc.*, No. 19-9540, 2019 WL 4387152, at *3 (E.D. La. Sep. 13, 2019)(citations omitted); *Progressive Healthcare Solutions LLC v. United Healthcare Services, Inc.*, No. 17-cv-01452, 2018 WL 809020, at *4 (W.D. La. Jan. 4, 2018).

[228] *Center for Reconstructive Breast Surgery, LLC v. Blue Cross Blue Shield of Louisiana*, No. 11-806, 2014 WL 4930443, at *6 (E.D. La., Sep. 30, 2014).

[229] No. 08-3713, 2008 WL 4059854, at *4 (E.D. La. Aug. 25, 2008)(citing *Memorial Hosp. System v. Northbrook Life Ins. Co.*, 904 F.2d 236, 250 (5th Cir. 1990) (holding that a third-party healthcare provider's negligent misrepresentation claim was not preempted by ERISA); *Jefferson Parish Hosp. Serv. Dist. No. 2 v. Principal Health Care of La., Inc.*, 934 F.Supp. 206, 209 (E.D. La. 1996) (holding that a detrimental reliance claim brought by a third-party healthcare provider against an ERISA plan was brought in the healthcare provider's independent status); *Jefferson Parish Hosp. Dist. No. 2 v. Cent. States*, 814 F.Supp. 25, 27 (E.D. La. 1993) (holding that ERISA did not preempt a hospital's detrimental reliance claim); *Intra-OPerative Monitoring Servs., Inc. v. Humana Health Benefit Plan of La., Inc.*, 2005 WL 1155847, at *2 (holding that the plaintiffs' claims were not preempted by ERISA because they were not seeking plan benefits, but instead were seeking to recover for detrimental reliance and breach of contact for failure to pay after verifying services).

Because the In-Network Exception letters in this case may constitute a separate agreement between Plaintiffs and Aetna, the Court must determine whether Plaintiffs seek a right to payment of benefits under the Plans or an agreed upon rate of payment. The Fifth Circuit's decision in *Lone Star OB/GYN Associates v. Aetna Health Inc.*[230] provides detailed guidance on making such a determination.

In *Lone Star*, the healthcare provider, contracted with Aetna Health, an administrator of ERISA Plans, via a Provider Agreement by which Lone Star became a "Participating Provider" for individuals enrolled in Aetna-administered insurance plans, thus entitling Lone Star to inclusion in physician directories that Aetna sends to its members.[231] Lone Star sued Aetna in Texas state court under the Texas Prompt Pay Act ("TPPA"), alleging that Aetna had not paid Lone Star's payment claims at the rates set out in the Provider Agreement and within the time period required by the TPPA.[232] Aetna removed the suit to federal court on the basis that ERISA completely preempted Lone Star's state law claims. The district court granted Lone Star's motion to remand, and Aetna appealed.[233]

Aetna argued that Lone Star's state law claims sought recovery of benefits due under the terms of their patients' Member Plans and were preempted by ERISA.[234] Lone Star argued that its state law claims stemmed solely from the Provider Agreement, as Aetna failed to pay the correct contractual rate for services rendered to patients who were Members of Aetna Plans.[235] The Fifth Circuit highlighted the two issues it was tasked to

---

[230] 579 F.3d 525 (5th Cir. 2009).
[231] *Id.* at 527.
[232] *Id.* at 528.
[233] *Id.*
[234] *Id.* at 529.
[235] *Id.*

resolve: "(1) whether state law claims that arise out of a contract between medical providers and an ERISA plan are preempted by ERISA; and (2) whether Lone Star's state law claims in fact implicate only rate of payment issues under the Provider Agreement, or if they actually involve benefit determinations under the relevant plan."[236]

The court noted that the Provider Agreement and the ERISA plans clearly cross-referenced each other:

> The Provider Agreement establishes that Aetna will pay Lone Star and Lone Star physicians' claims for "Covered Services," where "Covered Services" are those services recognized as "medically necessary" under the terms of the relevant ERISA plan. The ERISA plans state that Aetna will pay "Recognized Charges," and, under the definition of "Recognized Charges," state that where Aetna has an agreement with a health care provider, the "Recognized Charge" is the rate established in that agreement. The Provider Agreement also establishes the rates of payment receivable from Aetna for treating Plan Members. Under the Provider Agreement, Lone Star is to be paid the lesser of: (i) its usual, customary, and reasonable billed charges; (ii) the rates set forth in the Compensation Schedule; or (iii) the fee schedule in the Member's Plan.

> However, determination of the rate that Aetna owes Lone Star under the Provider Agreement does not require any kind of benefit determination under the ERISA plan. The fee schedules in the Member Plans in this case all refer back to the Provider Agreement. The Provider Agreement sets out the Compensation Schedule, which establishes the rate of payment as a fixed percentage of the "Aetna Market Fee Schedule," a standard schedule used by Aetna that is updated annually and based on the location where the service is performed. The Aetna Market Fee Schedule relies on codes used by doctors known as "CPT Codes," which identify the medical procedure performed by the doctor. Each CPT Code has a different rate of reimbursement under the Aetna Market Fee Schedule. Thus, in calculating what it owes Lone Star, Aetna determines the reimbursement rate under the Aetna Market Fee Schedule for each CPT Code submitted by the doctor, and pays Lone Star the fixed percentage (set out in the Provider Agreement) of that amount.[237]

---

[236] *Id.*
[237] *Id.* at 530.
Document Number: 68818

Lone Star conceded that, to calculate the correct contractual rate, the ERISA plan – and not the Provider Agreement - must be accessed to determine the amounts of the Plan Member's Copayment/Coinsurance/Deductible.  But, "Lone Star argue[d] that mere consultation of an ERISA plan is not enough to bring the claims within the scope of § 502(a)."[238]  The court agreed and explained:

> A claim that implicates the rate of payment as set out in the Provider Agreement, rather than the right to payment under the terms of the benefit plan, does not run afoul of *Davila* and is not preempted by ERISA. *See Blue Cross v. Anesthesia Care Assocs. Med. Group, Inc.*, 187 F.3d 1045, 1051 (9th Cir.1999). Though the plan and the Provider Agreement cross-reference each other, the terms of the plan—in particular, those related to coverage—are not at issue in a dispute over whether Aetna paid the correct rate for covered services as set out in the Provider Agreement. While Aetna is correct that any determination of benefits under the terms of a plan—i.e., what is "medically necessary" or a "Covered Service"—does fall within ERISA, Lone Star's claims are entirely separate from coverage and arise out of the independent legal duty contained in the contract and the TPPA.
>
> In so holding, we adopt the reasoning of the Third and Ninth Circuits, and that of a majority of district courts in this Circuit which have relied on this distinction between "rate of payment" and "right of payment." *See Anesthesia Care*, 187 F.3d at 1051; *Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 403–04 (3d Cir.2004). Anesthesia Care dealt with essentially identical facts to this case: a group of medical providers participating in an ERISA-regulated medical care plan offered by Blue Cross sued Blue Cross over changes to fee schedules that were specified in an agreement between Blue Cross and the providers. *See Anesthesia Care*, 187 F.3d at 1048. The Ninth Circuit found that the cause of action arose out of the provider agreement and thus did not fall under ERISA § 502(a), rejecting Blue Cross's argument that a reference in the provider agreements to "Physician's covered billed charges" depended on interpretation of the terms of the plan. *See id*. at 1051–52.[239]

The court opined that "*Davila* … does not support the proposition that mere reference to or consultation of an ERISA plan in order to determine a rate of pay is sufficient for

---

[238] *Id.*
[239] *Id.* at 530-31.
Document Number: 68818                                                                47

preemption."[240]    "[W]here claims do not involve coverage determinations, but have already been deemed 'payable,' and the only remaining issue is whether they were paid at the proper contractual rate, ERISA preemption does not apply."[241]

Following *Lone Star*, the court in *Crescent City Surgical Center v. Humana Health Benefit Plan of Louisiana, Inc.*, noted that: "Courts have further held the crucial question in situations like the present one is whether the dispute is over the 'right to payment, as opposed to the rate of payment.'[242] A determination of benefits under the terms of a plan, such as what constitutes a 'Covered Service' is a right to payment dispute, as opposed to a rate of payment."[243]

Notably, in *Lone Star* and *Crescent City*, the procedural postures before the courts were on Motions to Remand.  The legal principles established in those cases are relevant and applicable to this case; however, those cases applied a different standard than the summary judgment standard this Court must apply to the evidence in this matter.

Recently, another Section of this Court addressed a summary judgment motion in a case with facts similar to those before the Court.  In *Cardiovascular Specialty Care Center of Baton Rouge, LLC v. United Healthcare of Louisiana, Inc.*, the plaintiff, a provider of cardiovascular services to patients in Baton Rouge, Louisiana, brought suit to collect payment from the defendant, United Healthcare of Louisiana, Inc., for services that the plaintiff rendered to patients who were insured by the defendant.[244]  The general procedure the plaintiff used to communicate with the defendant before performing a

---

[240] *Id.* at 532.
[241] *Id.*
[242] No. 19-9540, 2019 WL 4387152, at *3 (E.D. La. Sep. 13, 2019)(quoting *Memorial Hermann Hospital System v. Aetna Health Inc.*, No. H-11-267 2011 WL 3703770 (S.D. Texas, Aug. 23, 2011)).
[243] *Id.* (quoting *Lone Star*, 579 F.3d at 531).
[244] No. 14-00235-BAJ-RLB, 2017 WL 2408125 (M.D. La. June 2, 2017).

procedure on an insured patient was undisputed.[245]  Before rendering medical services to a patient, the plaintiff would contact a representative of the defendant by telephone; during such a call, the plaintiff would provide information to the defendant regarding the diagnosis of a patient and the medical necessity of the proposed services.[246] In return, the defendant would communicate to the plaintiff a determination of medical necessity for purposes of coverage under each patient's insurance plan.[247] Following this telephone call, the plaintiff would access an online portal maintained by the defendant, whereby the plaintiff could access information about deductibles and co-insurance amounts associated with the patient's insurance plan.  Subsequently, the plaintiff would record the information obtained, which generally consisted of the patient's in-network and out-of-network deductibles and the maximum amount of expenses that a patient would be required to pay out-of-pocket for any medical services rendered.[248]

When the defendant allegedly failed to pay the claims submitted by the plaintiff to its satisfaction, Plaintiff filed suit, claiming—among other things—that it had relied, to its detriment, on representations made by the defendant that it would pay the claims.[249]  The defendant moved for summary judgment on the plaintiff's detrimental reliance claim, arguing that it never represented to the plaintiff that any of the procedures it performed on patients would be covered under those patients' plans or that it would pay a certain amount for those procedures.[250] The defendant also argued that it was "unreasonable for Plaintiff to rely on information regarding the medical necessity of a procedure and a

---

[245] *Id.* at *1.
[246] *Id.*
[247] *Id.*
[248] *Id.*
[249] *Id.* at *2.
[250] *Id.*

patient's level of benefits to assume that Defendant would pay Plaintiff a certain amount for a particular procedure."[251]

In granting summary judgment in favor of the defendant, the Court explained:

> **A determination of the medical necessity of a particular procedure is not the equivalent of a representation that benefits will be paid to cover the cost of that procedure;** rather, a medical-necessity determination is but the first step in the process to determine the coverage of a procedure under a patient's insurance plan. *See Toups v. Moreno Grp.*, No. 6: 11-cv-01559-RFD-CMH, 2013 WL 1187102, at *13 (W.D. La. Mar. 21, 2013). **In fact, Plaintiff has put forth no evidence that Defendant ever made any representation about the amount that it would pay on a certain claim or that Plaintiff obtained any claim-specific payment information from Defendant for any of the patients relevant to this litigation.** *See Ctr. for Restorative Breast Surgery, LLC v. Blue Cross Blue Shield of La.*, No. 2:11-cv-00806-SM-MBN, 2016 U.S. Dist. LEXIS 143531, at *33-34, 2016 WL 7332783 (E.D. La. Sept. 19, 2016) (finding that a healthcare provider's obtaining "basic plan information, such as the amount of the deductible, out-of-pocket maximum, and coinsurance" from an online portal maintained by an insurer did not amount to a "promise or representation" for purposes of a detrimental reliance claim because the healthcare provider failed to produce summary judgment evidence that "the insurer [would] pay for a specific claim" or that the online portal "contained a representation that the [insurer would] pay a certain amount for a procedure"). Further, Plaintiff has produced no evidence that the representatives of Defendant with whom Plaintiff communicated regarding the medical necessity of procedures had the authority to render decisions regarding benefits on Defendant's behalf or that the representatives portrayed themselves to have such authority. *See Toups*, 2013 WL 1187102, at *13.[252]

> **Plaintiff essentially asks the Court to convert Defendant's provision to Plaintiff of a medical-necessity determination and general benefits-level information into a *guarantee* that Defendant would pay a certain amount on a claim.** The law of detrimental reliance—a claim that is disfavored in Louisiana—does not allow for such a remedy. *See Ark-La-Tex Timber Co.*, 482 F.3d at 334. The conduct that Defendant engaged in pursuant to the evidence in this case—as conveyed to the Court by the Plaintiff—cannot be construed as a representation that Defendant would pay a certain amount on each claim that Plaintiff submitted to it, and therefore Plaintiff's detrimental reliance claim fails as a matter of law. *See*

---

[251] *Id.*
[252] *Id.* at *4 (emphasis added).

*Suire*, 2004-1459 at p. 32; 907 So. 2d at 59. Defendant therefore is entitled to summary judgment on Plaintiff's detrimental reliance claim. Fed. R. Civ. P. 56(a).[253]

In *Ambulatory Infusion Therapy Specialists, Inc. v. Aetna Life Insurance Company*,[254] the plaintiff's witness, who placed calls to the defendant insurance company to verify coverage for a patient, testified that she agreed with the statement, "'So at the end of the day Ambulatory Infusion contends that it should be paid these claims because Prudential improperly denied covered charges.'"[255] The witness also testified that no "representative of the defendants told her that the full amount of every bill for services provided would be paid."[256] Rather, the witness was told that the patient "was covered by the Plan and what the Plan paid for out-of-network services provided."[257] The evidence showed that Prudential's representative "**did not make any specific promise that the full amount billed for every service would be paid**."[258] When a claim was presented, the insurance company processed the claim and sent plaintiff the payment along with an explanation of benefits. On occasion, only partial payment of a claim was sent, along with an explanation of benefits. Based on this evidence, the court found that there were no misrepresentations and granted summary judgment in favor of the defendant insurer.[259]

Plaintiffs rely heavily on the Fifth Circuit's decision in *Access Mediquip, L.L.C. v. UnitedHealthcare Ins. Co.*,[260] wherein the court addressed Access' state law claims against United for the alleged failure to pay some or all of Access' claims for

---

[253] *Id*. at *4 (emphasis in original and added).
[254] No. H-05-4389, 2007 WL 320974 (S.D. Tex, Jan. 30, 2007).
[255] *Id*. at *4.
[256] *Id*.
[257] *Id*.
[258] *Id*. at *10 (emphasis added).
[259] *Id*.
[260] While this case involved oral representations and claims of negligent misrepresentation and promissory estoppel, the legal principles and analysis are instructive in this matter.

Document Number: 68818

reimbursement for medical device procurement and financing services on behalf of over 2,000 patients insured under ERISA plans administered by United.[261]

In that case, generally, a provider would request that Access finance and procure a medical device prior to the procedure using the device.    Access would subsequently contact the patient's insurer to confirm that the insurer will reimburse Access for the device and pay for Access's services. If the insurer would pay, Access would procure a suitable device and supply it to the provider, usually without charge.[262] Access would provide financing only after contacting the patient's insurer for confirmation that would reimburse Access for the device and its services. Access would generally refuse to procure or finance a device if the insurer advised Access that the patient was not covered, that the device or procedure was not covered, that pre-certification of the device was required and denied, or that Access may not directly bill the insurer for the device.[263]

Access alleged that, in at least three instances, Access spoke with a United representative who represented to Access that the procedures were authorized, and the devices were covered pursuant to the Plans.[264]   Thus, Access provided its services to these patients in reliance on United's representations regarding how much, and under what conditions, United would pay Access for those services.[265]   The court stated:

> Access's complaint thus makes clear that the grievance underlying its state law misrepresentation claims is the inconsistency between United's representations and its conduct after Access submitted claims for reimbursement for its services: "In direct breach of their obligations and representations to [Access], [United] ha[s] failed and refused to pay and/or reimburse [Access] on the Claims."[266]

---

[261] 662 F.3d 376 (5th Cir. 2011).
[262] *Id.* at 378-379.
[263] *Id.* at 379.
[264] *Id.* at 379-380.
[265] *Id.* at 380.
[266] *Id.* at 381.

…

It bears emphasis that, fairly construed, Access's claims allege that United's agents' statements, though superficially about coverage under the plan, were in their practical context assurances that Access could expect to be paid reasonable charges if it would procure or finance the devices used in L.G.'s, L.C.'s, and D.T.'s surgeries.[267]

The court noted that, under Texas law, "a party alleging an actionable misrepresentation to attempt to prove that it was reasonably misled by a true but crucially incomplete statement that conveyed a false impression of the speaker's intentions."[268] Pursuant to this law, the court stated that:

If the plans provide less coverage than United's agents indicated, Access must still prove that it was reasonable to rely on their statements as representations of how much and under what terms Access could expect to be paid. If the plans do provide the same level of coverage United indicated, Access may nevertheless seek to prove its misrepresentation claims by showing that United's statements regarding coverage, while accurate, were nevertheless misleading because United's agents omitted to mention that, covered or not, Access's services would not be reimbursed. *See Santanna Natural Gas Corp. v. Hamon Operating Co*. (a speaker who makes a partial disclosure assumes duty to tell whole truth, even when the speaker was under no duty to make the partial disclosure); *Int'l Sec. Life Ins. Co. v. Finck (same)*. Consultation of the plans' terms is thus not necessary to evaluate whether United's agents' statements were misleading. The finder of fact need only determine (1) the amount and terms of reimbursement that Access could reasonably have expected given what could fairly be inferred from the statements, and (2) whether United's subsequent disposition of the reimbursement claims was consistent with that expectation.[269]

The court rejected United's argument that Access' right to reimbursement depended on consultation with the Plans:

The state law underlying Access's misrepresentation claims does not purport to regulate what benefits United provides to the beneficiaries of its ERISA plans, but rather what representations it makes to third parties about the

---

[267] *Id*.
[268] *Id*. (citing *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 585 (Tex.App.—Houston [1 dist.] 2007)("a general duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression.")).
[269] *Id*. at 385.

extent to which it will pay for their services. To prevail on these claims, Access need not show that United breached the duties and standard of conduct for an ERISA plan administrator, because Access's alleged right to reimbursement does not depend on the terms of the ERISA plans. It is immaterial whether the alleged statements regarding the extent that the patients' plans covered Access's services were correct or incorrect as descriptions of the plans' terms. As assurances of how much Access would be paid, the statements are belied by United's subsequent refusal to reimburse some or all of Access's claims. United points out that it is a plan fiduciary and its decisions regarding what claims to pay constitute administration of an ERISA plan that is governed by that statute. The critical distinction, however, is not whether the parties to a claim are traditional ERISA entities, but whether the claims affect an aspect of a *relationship* that is comprehensively regulated by ERISA. *Bank of La. v. Aetna U.S. Healthcare Inc.*[270]

…

It is difficult to see how consultation of the plan's terms would be necessary to determine the amount of Access's recovery, given that the compensatory recovery Access seeks can be measured by the cost of the services it alleges United induced it to provide. If consultation of the plans is necessary, United concedes that this, without more, does not require preemption. *Id.* (explaining that the need to consult an ERISA plan in order to determine damages shows only an "incidental relation ... insufficient on these facts to require a finding of preemption.")[271]

In *Doctor's Hospital of Slidell, LLC v. United HealthCare Insurance Company*, which involved third party providers who sued defendants for claims arising under both ERISA and state law,[272] the plaintiffs alleged that their patients assigned to them any right to reimbursement under those health plans, and the defendants underpaid the benefits owed.[273] The plaintiffs actually pled the assignments as the basis for some of their claims.

The defendants argued that the plaintiffs' state law claims were preempted because they were fundamentally premised on recovering alleged underpayment of benefits pursuant to an ERISA plan or otherwise required interpreting plan language, and

---

[270] *Id.*
[271] *Id.* at 386.
[272] No. 10-3862, 2011 WL 13213620 (E.D. La. Apr. 27, 2011).
[273] *Id.* at *1.

therefore the claims undoubtedly "related to" the plan and were preempted.[274]   The

plaintiffs countered that some of the state law claims derived from breaches of

independent legal duties imposed by Louisiana law.   "For example, Plaintiffs argue that

their state law claims do not 'affect the relationship between the traditional ERISA entities,

namely the employer, the plan and its fiduciaries, and the participants and beneficiaries'

because they are independent health care providers, not plan participants or

beneficiaries, but this strains credibility because Plaintiffs are attempting to assert rights

assigned to them by participants and beneficiaries."[275]   Because the plaintiffs had

specifically based their state law claims of breach of contract, failure to pay on open

account, and unjust enrichment on the assignments from the patients, the court held that

these claims were "undoubtedly preempted."[276]  However, the court held otherwise as to

the plaintiffs' detrimental reliance claim, subject to leave to amend for specificity.[277]

> For this claim, the plaintiffs alleged that:

> Alternatively, in almost every instance, Plaintiff contacted patients' health plan (UHC) and/or its agent and received assurances from UHC and/or its agent that Plaintiff would be paid **a distinct percentage** of the reasonable and customary and/or unusual and customary fee for the contemplated medical service upon which Plaintiff relied to its detriment.[278]

The court held that this language was "insufficiently specific" but gave the plaintiffs leave

to amend "to specify in which instances they did and did not verify reimbursement before

providing services."[279]  However, the court explained:

> An adequately pleaded cause of action for detrimental reliance on pre-service verification is not preempted by ERISA. Courts in this district have

---

[274] *Id.* at *8.
[275] *Id.*
[276] *Id.* at *9.
[277] *Id.* at *10.
[278] *Id.* (emphasis added).
[279] *Id.*

held that if a health provider contacts an insurer before rendering service to an insured and the insurer allegedly **promises that it will pay a certain amount for the service**, a claim for detrimental reliance on that promise is not preempted by ERISA because the damages sought are for breach of the promise and not for failure to pay according to the terms of the plan. *E.g., Omega Hospital, L.L.C. v. Aetna Life Ins. Co.*, No. 08-3715, 2008 WL 4747864 (E.D. La. Oct. 24, 2008); *Jefferson Parish Hosp. Serv. Dist. No. 2 v. Principal Health Care of La., Inc.*, 934 F. Supp. 206, 209 (E.D. La. 1996) (Fallon, J.).[280]

In *Ponstein v. HMO Louisiana, Inc.*, the court addressed a promissory estoppel claim, which has similar elements to a claim of detrimental reliance.[281]   The facts of *Ponstein* were comparable to those herein, and the court granted summary judgment in favor of the insurer.  The court held:

> Even if the Plaintiff in this case can establish that a material misrepresentation was made, and that the circumstances are extraordinary, the Plaintiff cannot establish that his reliance on non-binding letters or oral representations was reasonable. As noted above, the Plan terms were unambiguous with regard to the exclusion of services relating to a penile prosthesis. The Fifth Circuit has held that a finding that the terms of the Plan are unambiguous undercuts the reasonableness of any detrimental reliance. *Id.* (citing *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litigations,* 58 F.3d 896, 902 (3d Cir.1995)). **The letter allegedly pre-authorizing the service of May 22, 2006 indicated that the claim was still subject to review.** Any reliance on this letter to modify the terms of the Plan would be unreasonable.
>
> Although the Plaintiff also asserts that his physician was informed by telephone that treatment would be covered, the Defendant indicates that the conversation included the standard disclaimer that **all treatment was subject to review**.[282]

---

[280] *Id.* (emphasis added).
[281] No. 08-663, 2009 WL 1309737 (E.D. La. May 11, 2009).
[282] *Id.* at *7 (emphasis added).

Further, other courts within this circuit have found that preapprovals do not waive an insurer's right to evaluate a claim when it is later submitted for reimbursement; it is unreasonable for a third party provider to assume payment was guaranteed.[283]

Based on the summary judgment evidence presented in this case and the applicable law set forth above, the Court finds that Aetna is entitled to partial summary judgment on the issue of complete ERISA preemption on Plaintiffs' breach of contract and detrimental reliance claims. The evidence in this case demonstrates that the In-Network Exception letters do not constitute a separate contract or agreement between Aetna and Plaintiffs in this case. First, these letters are addressed to the Plan members and Plaintiffs – not just the Plaintiffs. Second, unlike many of the cases cited by Plaintiffs, there is no evidence that any oral promises or written promises were made **in addition** to the In-Network Exception letters.

Plaintiffs argue that the approval language "at an in-network benefit level" constitutes a promise to pay a certain rate of payment. However, reading the In-Network Exception letters, it is clear that no specific amount of payment for services is promised. Indeed, the letters reference benefits – the determination of these benefits are interpreted by the Plans. Plaintiffs noted in their responses to Aetna's *Statement of Undisputed Facts* that one of the issues they appealed for Member 1's services was that Aetna "should have negotiated rates with Plaintiffs," which obviously suggests that Aetna did not establish a rate of payment in the In-Network Exception letters related to those

---

[283] *Fustok v. UnitedHealth Grp., Inc.*, No. 12–cv–787, 2012 WL 12937486, at *5 (S.D. Tex. Sept. 6, 2012) (dismissing promissory estoppel claim because "preapprovals" did not waive United's right to evaluate the claim when it was later submitted for reimbursement and it was unreasonable for plaintiff to assume payment was guaranteed).

services.[284]   It is also evident that, with every authorization, there is a notation that coverage for each service "has been approved, subject to the requirements in this letter."[285]   Later in the letters, Aetna states: "Validity of this coverage approval is subject to all those components being satisfied at the time the approved services are actually provided.   This coverage approval is NOT effective and benefits may not be paid if: …. (5) the approved procedures or services are not covered due to a preexisting condition limitation or exclusion under the plan (if allowed by law)…"[286] Language in the Plans also states that pre-certification or prior approval is not a guarantee of payment.[287]

Several of the cases cited by Plaintiffs are distinguishable and/or highlight what is missing from Plaintiffs' evidence.  Plaintiffs rely on the holding in *Sarasota County*, a non-binding case decided by the district court for the Middle District of Florida.[288] First, the procedural posture before the court in *Sarasota County* was addressing Motions to Dismiss; the court only analyzed the sufficiency of the complaints and was not called upon to analyze summary judgment evidence.   Also, the parties entered into Provider

---

[284] Rec. Doc. No. 30-1, p. 8.
[285] Rec. Doc. No. 30-3, p. 3.
[286] *Id.* at p. 6.
[287] The Exxon Plan provides: "A pre-determination is an estimate of covered services and benefits payable in advance of treatment. It is not a guarantee of benefits eligible or payment amount." Rec. Doc. No. 27-1, p. 43. "A written pre-determination request will result in a detailed response as to whether a … service is covered under the … Plan and whether the proposed cost is within reasonable and customary limits…. …[A] pre-determination, either verbal or written, is not a guarantee of payment, as claims are paid based on the actual services rendered and in accordance with Plan provisions." *Id.* at p. 103.
 The Entergy Plan provides: "The prior approval of a Pre-Service Claim does not guarantee payment or assure coverage; it means only that the information furnished … indicates that the requested … treatment is Medically Necessary…. A Pre-Service Claim receiving prior approval … must still meet all other coverage terms, conditions and limitations for payment. Coverage for any such Pre-Service Claim receiving prior approval may still be limited or denied after the care or treatment is completed and a Post-Service Claim is filed if: (1) a benefit exclusion or limitation applies, … (4) Out-of-Network limitations apply, or (5) any other limitation or exclusion in the Plan applies to limit or exclude the Claim." Rec. Doc. No. 27-6, p. 67. "… Precertification does not guarantee that any particular Claim will be paid. All Claims are subject to all Plan rules, including Deductibles, Coinsurance, maximums, Reasonable Charge and Medical Necessity limitations." *Id.* at p. 59.
[288] 511 F.Supp.3d 1240.

Document Number: 68818

Agreements that were between the providers and the insurers only. The plaintiff argued that, once a hospital service was authorized, the insurers were "contractually obligated to pay the contracted rates[.]"[289] The court interpreted the plaintiff's claim as a challenge to the defendants' "underpayments under an agreed fee schedule[.]"[290] Additionally, the court ruled in favor of the providers because they alleged that "the Provider Agreements established a course of dealing under which a pre-authorization for hospital services constitutes a promise of payment" and noted: "That promise bears little relevance to obligations under a benefit plan."[291] Here, Plaintiffs have presented no evidence of a contract wherein Aetna agreed to specific contracted rates. No fee schedules are included in the In-Network Exceptions. There is no evidence of a "course of dealing" between Plaintiffs and Aetna suggesting that the In-Network Exceptions constituted promises of payment.

In *Lone Star*, the Fifth Circuit reviewed the district court's remand of certain state law claims to state court; it did not review the case on a summary judgment standard. Further, the court held that the rate of payment was established in the Provider Agreement, not the Plans (although consultation of the Plans might be necessary), because:

> The fee schedules in the Member Plans in this case all refer back to the Provider Agreement. The Provider Agreement sets out the Compensation Schedule, which establishes the rate of payment as a fixed percentage of the "Aetna Market Fee Schedule," a standard schedule used by Aetna that is updated annually and based on the location where the service is performed . . . in calculating what it owes Lone Star, Aetna determines the reimbursement rate under the Aetna Market Fee Schedule for each CPT

---

[289] *Id.* at 1245-46 (internal quotation marks omitted).
[290] *Id.* at 1249.
[291] *Id.* at 1248 (citations omitted).

Code submitted by the doctor, and pays Lone Star the fixed percentage (set out in the Provider Agreement) of that amount.[292]

In contrast, the In-Network Exceptions do not establish any rate of payment, they repeatedly approve coverage rather an amount or percentage guaranteed for each service, and the fee schedules and other materials used to calculate payments do not appear anywhere in the In-Network Exceptions – they are generally found in the Plans.

In *Access Mediquip*, United employees represented to Access that each of the three patients in question were insured by United and had coverage for the contemplated surgical procedures and indicated that Access could bill United for the services provided.[293] Thereafter, United subsequently refused to reimburse Access.[294] In characterizing Access's claims, the court stated that, "fairly construed, Access's claims allege that United's agents' statements, though superficially about coverage under the plan, were in their practical context assurances that Access could expect to be paid reasonable charges if it would procure or finance the devices used in [the patients'] surgeries."[295] Thus, United's statements constituted representations, **unqualified by any condition**, that it would reimburse Access for the contemplated services.

Here, the "promises" that Plaintiffs would be paid at an in-network benefit level are necessarily conditioned on coverage that is conditioned upon medical necessity, which is clearly communicated in the In-Network Exception letters: "Coverage for this service has been approved, subject to the requirements in this letter."[296]   "This coverage approval is NOT effective and benefits may not be paid … if the approved procedures or services are

---

[292] *Lone Star*, 579 F.3d at 530.
[293] 662 F.3d at 379-80.
[294] *Id.*
[295] *Id.* at 381.
[296] *See, e.g.,* Rec. Doc. No. 30-3, p. 5.
Document Number: 68818

not covered due to … exclusion under the plan."[297]  Thus, the promise is not that Plaintiffs would be reimbursed a specified amount for services; rather, it is a representation of when the services would be covered.  This "promise" is expressly conditional and necessarily turns on interpretation of "covered service" and "medical necessity" under the Plans.

The Court finds that this case is most analogous to *Cardiovascular Specialty Care*, wherein the Court held that "Plaintiff has put forth no evidence that Defendant ever made any representation about the amount that it would pay on a certain claim or that Plaintiff obtained any claim-specific payment information from Defendant for any of the patients relevant to this litigation."[298]  The Court noted that: "Plaintiff essentially asks the Court to convert Defendant's provision to Plaintiff of a medical-necessity determination and general benefits-level information into a *guarantee* that Defendant would pay a certain amount on a claim."[299]  Based on the evidence submitted in this matter, the Court finds that this is precisely what the Plaintiffs seek herein.  And, as set forth by jurisprudence cited above, in terms of proving detrimental reliance, any reliance on preauthorization letters that indicate that a claim is covered - but subject to review or contain a disclaimer that it is not a guarantee of payment - are simply unreasonable.

Accordingly, the Court finds that the In-Network Exceptions do not provide a rate of payment; rather they implicate a right to benefits available under the Plans.  The In-Network Exceptions do not simply cross-reference the Plans or overlap with promises set forth therein; rather, the terms of the In-Network Exceptions depend almost entirely on consultation with and interpretation of the Plans. Plaintiffs have presented no summary

---

[297] *Id*. at p. 6.
[298] 2017 WL 2408125 at *4.
[299] *Id*.

judgment evidence that demonstrates a genuinely disputed fact issue regarding preemption. Therefore, the Court grants Aetna's motion and finds that Plaintiffs' state law breach of contract and detrimental reliance claims are completely preempted by ERISA. The Court makes no ruling on the substantive merits of Aetna's reimbursement decisions.

## IV.    CONCLUSION

For the reasons set forth above, Aetna's *Motion for Partial Summary Judgment*[300] is GRANTED.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 28th day of September, 2021.

_____

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[300] Rec. Doc. No. 24.
Document Number: 68818